UNITED STATES of America,
Plaintiff-Appellee,

v.

Larry Allen MYERS,
Defendant-Appellant.

No. 76–1489.

United States Court of Appeals,
Fifth Circuit.

April 15, 1977.

Richard A. Lazzara (Court-appointed), Tampa, Fla., for defendant-appellant.

John L. Briggs, U.S. Atty., Jacksonville, Fla., Terry Smiljanich, Asst. U.S. Atty., Tampa, Fla., for plaintiff-appellee.

Before TUTTLE, CLARK and RONEY, Circuit Judges.

CLARK, Circuit Judge:

Larry Allen Myers challenges the validity of his federal bank robbery conviction. He contends that the district court committed reversible error when it (1) refused to strike the testimony of alibi rebuttal witnesses whose identities were not disclosed before the trial, (2) admitted evidence indicating that Myers had previously been convicted of armed bank robbery, and (3) gave the jury a flight instruction that lacked sufficient

evidentiary support. We agree, and therefore we reverse the decision of the district court.[1]

On June 13, 1974, at approximately two o'clock in the afternoon, a branch of the First Federal Savings and Loan Association of Largo, located in Clearwater, Florida, was robbed by a lone gunman. He escaped with an estimated $1500. After changing cars at a nearby motel, the robber disappeared. There is no dispute about how the robbery was committed; the central issue in this case, despite two eye witnesses and hundreds of still photographs taken by an automatic camera, is by whom. The government has proceeded on the theory that it was Myers who entered the bank brandishing a revolver, ordered a teller to place the contents of her cash drawer in a flimsy brown paper bag, and fled. Myers has steadfastly maintained that it was not.

On September 13, 1975, a federal grand jury charged Myers with three counts of violating 18 U.S.C.A. § 2113(a), (b) & (d) (Supp.1976). The government's task in prosecuting Myers on these charges was complicated when a friend of Myers' named Dennis Coffie, who bears a remarkable physical resemblance to Myers, pled guilty to having been the lone gunman in the Florida robbery.[2] A superseding indictment consolidating the Florida charges into one count was returned against Myers on August 13, 1975. Since then Myers has been tried twice. The first trial ended with the declaration of a mistrial after the jury announced its inability to reach a verdict. A fortnight later, a second jury found Myers guilty as charged. The district court sentenced him to ten years' imprisonment on February 17, 1976.

*Nondisclosure of Alibi Rebuttal Witnesses*

Myers' primary argument on this appeal is that the district court committed reversible error when it refused to strike the testimony of the witnesses on whom the government relied to discredit his alibi defense. In order to properly assess the merit of this contention, it is necessary to examine in detail some of the circumstances surrounding the first and second trials.

Prior to the first trial, the government served Myers with a written demand for notice of his intent to assert an alibi defense, pursuant to Rule 12.1 of the Federal Rules of Criminal Procedure.[3] Myers re-

---

1. Myers also asserts that the district court erred in denying his motion for a judgment of acquittal. We do not discuss this issue since it will occur in a different context, if at all, on retrial.

2. Coffie also pled guilty to charges that he committed an armed bank robbery in Warren, Pennsylvania, on July 29, 1974. Myers too, was indicted in connection with the Pennsylvania robbery. He pled not guilty, but was convicted on February 10, 1975.

3. Rule 12.1 provides:

   *(a) Notice by Defendant.* Upon written demand of the attorney for the government stating the time, date, and place at which the alleged offense was committed, the defendant shall serve within ten days, or at such different time as the court may direct, upon the attorney for the government a written notice of his intention to offer a defense of alibi. Such notice by the defendant shall state the specific place or places at which the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses upon whom he intends to rely to establish such alibi.

   *(b) Disclosure of Information and Witness.* Within ten days thereafter, but in no event less than ten days before trial, unless the court otherwise directs, the attorney for the government shall serve upon the defendant or his attorney a written notice stating the names and addresses of the witnesses upon whom the government intends to rely to establish the defendant's presence at the scene of the alleged offense and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses.

   *(c) Continuing Duty to Disclose.* If prior to or during trial, a party learns of an additional witness whose identity, if known, should have been included in the information furnished under subdivision (a) or (b), the party shall promptly notify the other party or his attorney of the existence and identity of such additional witness.

   *(d) Failure to Comply.* Upon the failure of either party to comply with the requirements of this rule, the court may exclude the testimony of any undisclosed witness offered by such party as to the defendant's absence from or presence at, the scene of the alleged offense. This rule shall not limit the right of the defendant to testify in his own behalf.

sponded on December 23, 1975, indicating that he did intend to offer an alibi defense, and named Ronald Akers, Marlin Downey, and Coffie as his proposed alibi witnesses. The following day the government filed a document styled "Government's Response to Notice of Alibi Defense," in which it listed two tellers from the robbed bank and Janice Johns[4] as the witnesses on whose testimony it planned to rely in attempting to establish Myers' presence at the scene of the robbery. It further stated:

> Names and addresses of other witnesses to be relied on to rebut testimony of defendant's alibi witnesses shall be made known to defendant as they are ascertained by the Government under its continuing duty pursuant to the Rule.

Neither Myers nor the government ever supplemented their witness lists.

At the first trial Myers used all three of his proposed witnesses in attempting to establish his alibi defense. Coffie testified that he committed the Florida robbery by himself, and Downey stated that on the afternoon of the robbery he had encountered Myers at Disneyworld, an amusement park located approximately 80 miles from Clearwater. Despite the importance of their testimony, the fate of Myers' alibi defense rested largely on the testimony of Ronald Akers. Akers testified that he and Myers had spent the entire afternoon of June 13, 1974—the day on which the robbery occurred—at Disneyworld, in the company of two girls whom Akers had met the previous evening. Akers explained that he was certain of the date because the girls had to catch a United Airlines flight to Detroit on Saturday, June 15, 1974. He said that he remembered their airline, destination, and date of departure, because he

had seen their tickets and because he drove them to the Tampa airport on Saturday morning.

During the week following the first trial, the government investigated Akers' story. On the day before the defense began to present its evidence in the second trial, the United States Attorney prosecuting the case contacted Myers' counsel and suggested that he warn his witnesses against perjuring themselves. He did not mention the possibility that the government might call additional witnesses at the second trial.

The testimony of Coffie, Akers, and Downey at the second trial was substantially the same as it had been at the first. But in reply the government called four witnesses not listed in its response to Myers' notice of his intent to offer an alibi defense, whose statements were designed to discredit Akers' testimony. One of them was Robert Labrenz, an employee of United Airlines. He testified that United had no flight from Tampa to Detroit on June 15, 1974, but that other airlines had such flights. The other three witnesses, Patricia Coogle, Raymond LaBranch, and Roy Pruitt were all employees of a car dealership in Tampa, Florida. Their combined testimony indicated that Akers had been employed at the same car dealership as a mechanic, and had worked 48 hours during the week of June 10, 1974. This was inconsistent with Akers' testimony that he had been unemployed during June of 1974, and tended to conflict with his statement that he had not worked on Thursday and Friday of the week of June 10, 1974.

Before the case was given to the jury, defendant's counsel moved for a mistrial, and, in the alternative, for an order striking the testimony of the four new government

---

(e) *Exceptions.* For good cause shown, the court may grant an exception to any of the requirements of subdivisions (a) through (d) of this rule.

(f) *Inadmissibility of Withdrawn Alibi.* Evidence of an intention to rely upon an alibi defense, later withdrawn, or of statements made in connection with such intention, is not admissible in any civil or criminal proceeding against the person who gave notice of the intention.

Since Rule 12.1 became effective on December 1, 1975, it is applicable to this case. *See* Act of July 31, 1975, Pub.L. No. 94–64, § 2, 89 Stat. 370 (1975).

4. Johns was an acquaintance of Myers and Coffie, and a confessed accomplice in the Florida robbery, who testified at trial that Myers had told her that he was the lone gunman.

witnesses, on the grounds that their names had not been disclosed prior to trial as required by Rule 12.1. The district court denied both motions. It held, first, that the government had not violated the rule, and second, that if it had, good cause existed to grant the government an exemption from the requirements of sections (b) and (c).

Rule 12.1(a) of the Federal Rules of Criminal Procedure requires a defendant to disclose, upon receipt of a written government request, whether he intends to offer an alibi defense, the place where he claims to have been at the time the alleged offense was committed, and the names and addresses of the witnesses upon whom he intends to rely in attempting to establish his alibi. Section (b) of the Rule requires reciprocal disclosure of witnesses unearthed by the government,[5] and section (c) makes the duty to disclose a continuing obligation for both parties. Section (e) authorizes the district court to excuse a party from compliance with the disclosure requirements upon a showing of good cause, and section (d) empowers him to penalize unexcused noncompliance by excluding the testimony of undisclosed witnesses. At issue here is the scope of the government's duty to disclose under sections (b) and (c).

The language of section (b) appears to require disclosure of two types of witnesses: (1) those relied upon "to establish the defendant's presence at the scene of the alleged offense", and (2) "any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses." We think that all four of the undisclosed government witnesses fall within the class delineated by the second phrase. Rebuttal evidence is evidence introduced to refute, contradict, or disprove evidence adduced by an adverse party. Since the testimony of the undisclosed witnesses was concededly introduced for the purpose of showing that Akers' testimony concerning his activities

during the week of June 10, 1974, was false, they are alibi rebuttal witnesses within the meaning of Rule 12.1(b). Accordingly, the government had a continuing duty under section (c) to notify the defendant of their existence.

The government's duty to disclose was not discharged by the oblique warning which counsel for the government gave Myers' attorney orally on the eve of the second trial. Section 12.1(b) expressly requires "a written notice stating the names and addresses of the witnesses upon whom the government intends to rely."

The government's position is that section (b) requires disclosure only of witnesses who actually place the defendant at the scene of the crime, and that it does not apply to the undisclosed witnesses in this case, because they were used solely to impeach the credibility of one of the defendant's alibi witnesses. It argues that when section (b) is read with section (d), which gives the district courts the discretionary power to "exclude the testimony of any undisclosed witness offered by [either] party as to the defendant's absence from or presence at, the scene of the alleged offense", it is at best unclear whether section (b) defines two classes of witnesses whose identities must be divulged, or merely one. In view of this alleged uncertainty in the language of the Rule, the government urges that section (b) should be construed to apply only to those witnesses who place the defendant at the scene of the crime. For support it relies upon the general principle that "rebuttal witnesses are a recognized exception to all witnesses disclosure requirements."[6]

To read Rule 12.1 in this fashion would be revision, not construction. If section (b) were interpreted to cover only witnesses testifying to the defendant's presence at or absence from the scene of the offense, its final phrase would be reduced to surplus-

---

**5.** This reciprocity may be a constitutional necessity. In *Wardius v. Oregon,* 412 U.S. 470, 480, 93 S.Ct. 2208, 2214, 37 L.Ed.2d 82, 86 (1973), the Supreme Court held that the Due Process clause of the Fourteenth Amendment barred enforcement of a state notice-of-alibi rule that did not provide the defendant reciprocal discovery rights against the government.

**6.** *See United States v. Windham,* 489 F.2d 1389, 1392 (5th Cir. 1974).

age. Furthermore, the government's reliance on a general principle is misplaced. The purpose of the rule is to deal specially with alibi rebuttal witnesses. The general principle is antithetical to the whole concept of Rule 12.1. The legislative history of the Rule confirms our view. Rule 12.1 was radically amended by the Congress because it did not believe that the defendant-triggered version approved by the Supreme Court[7] afforded the government sufficient protection against the assertion of eleventh-hour alibi defenses. As the House Judiciary Committee explained in its report on the Rule, it viewed a government-triggered procedure as preferable because

"[t]he major purpose of a notice-of-alibi rule is to prevent unfair surprise to the prosecution."

But it then went on to say:

[t]he Committee's rule does not operate only to the benefit of the prosecution. In fact, its rule will provide the defendant with more information than the rule proposed by the Supreme Court. The rule proposed by the Supreme Court permits the defendant to obtain a list of only those witnesses who will place him at the scene of the crime. The defendant, however, would get the names of these witnesses anyway as part of his discovery under Rule 16(a)(1)(E). The Committee rule not only requires the prosecution to provide the names of witnesses who place the defendant at the scene of the crime, but it also requires the prosecution to turn over the names of those witnesses who will be called in rebuttal to the defendant's alibi witnesses. This is information that the defendant is not otherwise entitled to discover. H.R.Rep. No. 94–247, 94th Cong., 1st Sess. (1975), reprinted in [1975] U.S.Code Cong. & Adm. News, pp. 674, 681.[8]

This statement indicates that Congress intended section (b) to require government disclosure, not just of witnesses placing the defendant at the scene of the offense, but also of witnesses like those whose identities the government failed to reveal in this case. Therefore, the government violated sections (b) and (c) when it failed to furnish the defendant with the names and addresses of the four additional witnesses prior to the beginning of the second trial.

■ The district court found that in the event the government had violated sections (b) and (c), its noncompliance should be excused. Although the precatory language of section (e) gives the district court the discretionary power to grant exceptions "for good cause shown," there are two reasons why the court below abused its discretion by granting one in this case.

■ First, the district court failed to describe the circumstances that constituted good cause. Absent such an explanation, granting an exception is improper. We note in passing that none of the after the fact justifications proffered by the Government—that the undisclosed witnesses were merely rebuttal witnesses, that they were not discovered until immediately before trial, and that their testimony was not conclusive—would be sufficient to satisfy the good cause requirement. Second, the government did not apply for an exception to the disclosure requirements at the time the new witnesses were discovered, when compliance with sections (b) and (c) would have been possible if its request had been denied. Rule 12.1 was intended to prevent prejudicial surprise to the parties and to obviate the need for continuances which arise when one side introduces unexpected testimony at trial. Advisory Committee Notes on Rule 12.1 of the Federal Rules of Criminal Procedure, 62 F.R.D. 271, 294–95; see *Williams v. Florida*, 399 U.S. 78, 82, n. 8, 90 S.Ct. 1893, 1896, 26 L.Ed.2d 446, 450 (1970). These purposes would be frustrated

---

7. For the text of the version of Rule 12.1 approved by the Supreme Court see, Proposed Amendments to Federal Rules of Criminal Procedure, 62 F.R.D. 271, 292–293 (1974).

8. After the publication of the House Report, the Conference Committee deleted subsection (a)(1)(E) from Rule 16. Conf.Rep. No. 94–414, 94th Cong., 1st Sess. (1975) reprinted in [1975] U.S.Code Cong. & Adm.News, pp. 713, 716.

if applications for exceptions could be tendered after undisclosed witnesses had already testified. By then, the harm which the Rule seeks to prevent would have occurred, and the trial judge would be reduced to trying to mitigate the injury to the defendant's case by granting a continuance, retroactively excluding the improper testimony, or in extreme cases, declaring a mistrial.

■ The district court also abused the discretion conferred upon it by section (d) when he denied the defendant's motions to strike the testimony and documentary evidence furnished by the undisclosed witnesses. Although section (d) authorizes the district courts to "exclude the testimony of any undisclosed witness offered by [a] party as to the defendant's absence from or presence at, the scene of the alleged offense" and does not contain the additional phrase, "and any other witnesses to be relied on to rebut testimony of any of the defendant's alibi witnesses", which is found in section (b), the difference in wording has no significance. As counsel for the government aptly stated during oral argument, it would be "mere sophistry" to suggest that the scope of the district court's power to exclude the testimony of undisclosed witnesses does not extend to both classes of witnesses whose names and addresses must be reported under section (b). Nor does the exclusion of documentary evidence supplied by an undisclosed alibi rebuttal witness lie beyond the bounds of the trial judge's power under section (d). The authority to exclude evidence flowing from undisclosed sources is an integral part of Rule 12.1, and is essential to its effective operation. *See* Advisory Committee Notes on Rule 12.1 of the Federal Rules of Criminal Procedure 62 F.R.D. at 294; Epstein, Advance Notice of Alibi, 55 J.Crim.L., C. & P.S. 29, 36 (1965). It should not be defined too narrowly.

■ In determining how to exercise its discretionary power to exclude the testimony of undisclosed witnesses under section (d), a district court should consider (1) the amount of prejudice that resulted from the failure to disclose, (2) the reason for nondisclosure, (3) the extent to which the harm caused by nondisclosure was mitigated by subsequent events, (4) the weight of the properly admitted evidence supporting the defendant's guilt, and (5) other relevant factors arising out of the circumstances of the case. *Cf.* Advisory Committee Notes on Rule 16 of the Proposed Federal Rules of Criminal Procedure 39 F.R.D. 69, 178 (1966).[9]

■ Here the prejudice to the defense was substantial and remained unabated. Myers' counsel was deprived of the opportunity to interview the four undisclosed witnesses, to recheck the stories of Myers, Akers, and Downey in light of the additional evidence, and, most importantly, to reconsider his decision to put Akers and Downey on the stand. The Rule entitles a defendant to evaluate the strategy of advancing an alibi defense in light of the named rebuttal witnesses. In addition, the government's reason for nondisclosure is feeble: it asserts that it did not believe that the witnesses were within the scope of the Rule. While this falls short of bad faith, it thwarts the central purposes of a provision designed to make criminal trials fairer because it tests coverage through confrontation at trial, rather than by submission to the district court in advance. Finally, as counsel for the government conceded at oral argument, the evidence against Myers is weak. Since all four of the factors present in this case weigh in favor of exclusion, the district court abused its discretion when it failed to exclude the testimony of the undisclosed alibi rebuttal witnesses.

**9.** The Advisory Committee Notes explain that in determining whether to impose sanctions under Rule 16(g) for failure to permit discovery the district court should consider

. . . the reasons why disclosure was not made, the extent of the prejudice, if any, to the opposing party, the feasibility of rectify-

ing that prejudice by a continuance, and any other relevant circumstances.

Although Rule 16 was amended in 1975, *see* Act of July 31, 1975, Pub.L. No. 94–64, § 3, 89 Stat. 370, 375 (1975), new subsection (d)(2) merely restates the essentials of the superseded 16(g).

### Admission of Evidence of a Crime not Charged in the Indictment

Myers also insists that the district court erred in admitting evidence of the subsequent bank robbery in Pennsylvania for the alleged purpose of identifying Myers as the perpetrator of the Florida robbery.[10] We agree.

Evidence of crimes not charged in the indictment is not admissible for the purpose of showing that the defendant has a criminal disposition in order to generate the inference that he committed the crime with which he is charged. Fed.R.Evid. 404(b); [11] *Michelson v. United States*, 335 U.S. 469, 475–76, 69 S.Ct. 213, 218, 93 L.Ed. 168, 173 (1948); *United States v. Cox*, 536 F.2d 65, 70 (5th Cir. 1976); *United States v. Crockett*, 514 F.2d 64, 71 (5th Cir. 1975). A concomitant of the presumption of innocence is that a defendant must be tried for what he did, not for who he is. The reason for this rule is that it is likely that the defendant will be seriously prejudiced by the admission of evidence indicating that he has committed other crimes. *United States v. San Martin*, 505 F.2d 918, 921 (5th Cir. 1974); *United States v. Broadway*, 477 F.2d 991, 994 (5th Cir. 1973); E. Cleary, McCormick on Evidence § 190, p. 447 (rev. ed. 1972); *see United States v. Brown*, 548 F.2d 1194, 1206–1207 (5th Cir. 1977); Slough &

Knightly, Other Vices, Other Crimes, 41 Iowa L.Rev. 325, 326 (1956).[12] Because the risk of prejudice is so great, we have held that there are two conditions that must be satisfied before evidence of other crimes may be admitted. First, the threshold prerequisites to admission must be met. There prerequisites are:

(1) Proof of the other similar crimes must be plain, clear and convincing.

(2) The other crimes must not be too remote in time from the charged offense.

(3) The evidence of the other crimes must be introduced for a purpose sanctioned by Rule 404(b) of the Federal Rules of Evidence.

(4) The element of the charged offense that the evidence of other crimes is introduced to prove must be a material issue in the case.

(5) There must be a substantial need for the probative value of the evidence of the other crimes.

*See United States v. Taglione*, 546 F.2d 194, 199 (5th Cir. 1977); *United States v. Bloom*, 538 F.2d 704, 708 (5th Cir. 1976); *United States v. San Martin*, 505 F.2d at 921–22; *United States v. Broadway*, 477 F.2d at 994–95. Second, the probative value of the evidence of other crimes must outweigh the prejudice to the defendant that may result from its admission. Fed.R.Evid. 403; [13]

> The natural and inevitable tendency of the tribunal—whether judge or jury is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge . . . . These reasons of auxiliary policy . . ., directed to prevent the risks of reaching verdicts through insufficient evidence, have operated to exclude that which is in itself relevant.
>
> 1 J. Wigmore, Evidence § 194, p. 646 (3d ed. 1940).

**13.** Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

---

**10.** The fact that the uncharged crime occurred after rather than before the charged crime does not affect its admissibility. *United States v. Pollard*, 509 F.2d 601, 604 (5th Cir. 1975), *cert. denied sub nom. United States v. Pollard*, 421 U.S. 1013, 95 S.Ct. 2419, 44 L.Ed.2d 681 (1975) and *United States v. Herman*, 423 U.S. 845, 96 S.Ct. 84, 46 L.Ed.2d 68 (1975); *United States v. Alston*, 460 F.2d 48, 55 (5th Cir. 1972), *cert. denied*, 409 U.S. 871, 93 S.Ct. 200, 34 L.Ed.2d 122 (1972).

**11.** Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**12.** Wigmore describes the nature of this prejudice and the function of the rule as follows:

*United States v. Bloom,* 538 F.2d at 709; *United States v. Lewis,* 531 F.2d 1258, 1259 (5th Cir. 1976), *cert. denied,* 429 U.S. 863, 97 S.Ct. 168, 50 L.Ed.2d 142 (1977); *United States v. Hearod,* 499 F.2d 1003, 1005 (5th Cir. 1974); *United States v. Goodwin,* 492 F.2d 1141, 1150 (5th Cir. 1974); Advisory Committee Notes on Rule 404(b) of the Federal Rules of Evidence, 56 F.R.D. 183, 221 (1972).[14] This balancing is largely committed to the sound discretion of the district court, *United States v. Bloom,* 538 F.2d at 709; *United States v. Crockett,* 514 F.2d at 74, subject to reversal where this discretion has been abused. *United States v. Goodwin,* 492 F.2d at 1154; *United States v. Vosper,* 493 F.2d 433, 437 (5th Cir. 1974).

The government asserts that the evidence of the Pennsylvania bank robbery was admissible to prove that Myers committed the Florida bank robbery because it exhibits his characteristic *modus operandi.* This is a proper purpose.[15] Fed.R.Evid. 404(b); *United States v. Meastas,* 546 F.2d 1177, 1181 (5th Cir. 1977); *United States v. Goodwin,* 492 F.2d at 1154; *United States v. Jackson,* 451 F.2d 259, 263 (5th Cir. 1971); 1 J. Wigmore, Evidence § 217, p. 719 (3d ed. 1940); E. Cleary, McCormick on Evidence § 190, p. 451 (rev. ed. 1972). The probity of evidence of other crimes where introduced for this purpose depends upon both the uniqueness of the *modus operandi* and the degree of similarity between the charged crime and the uncharged crime. Of course, it is not necessary that the charged crime and the other crimes be identical in every detail. *Bradley v. United States,* 140 U.S.

App.D.C. 7, 433 F.2d 1113, 1121 (1969). But they must possess a common feature or features that make it very likely that the unknown perpetrator of the charged crime and the known perpetrator of the uncharged crime are the same person. The more unique each of the common features is, the smaller the number that is required for the probative value of the evidence to be significant. But a number of common features of lesser uniqueness, although insufficient to generate a strong inference of identity if considered separately, may be of significant probative value when considered together. *People v. Haston,* 69 Cal.2d 233, 245–246, 70 Cal.Rptr. 419, 427, 444 P.2d 91, 99 (1968); *see United States v. Cavallino,* 498 F.2d 1200 (5th Cir. 1974).[16] The evidence of other crimes involved in this case was admitted on this theory.

A much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind. E. Cleary, McCormick on Evidence § 170, p. 452 (rev. ed. 1972). *Compare United States v. Goodwin,* 492 F.2d at 1154, *with United States v. Shadletsky,* 491 F.2d 677, 678 (5th Cir. 1974). We have consistently held that for evidence of other crimes to be admissible the inference of identity flowing from it must be extremely strong. In *United States v. Goodwin, supra,* for example, we said that evidence of a prior crime was inadmissible to prove identity because the two crimes did not "bear such peculiar, unique, or bizarre similarities as to mark

---

14. We recognize that no such balancing was articulated in *United States v. Maestas,* 546 F.2d 1177 (5th Cir. 1977). Doubtless this is explained by the remarkably high probative value of the evidence of similar acts presented in that case.

15. As we stated in *United States v. Goodwin, supra,* "The 'identity' exception . . . is used either in conjunction with some other basis for admissibility or synonymously with *modus operandi.*" 492 F.2d at 1154. *See* E. Cleary, McCormick on Evidence § 190, p. 451 (rev. ed. 1972).

16. Wigmore summarizes the principles governing the use of evidence to prove identity in the following fashion:

> In the process of identification of two supposed objects by a common mark, the force of the inference depends on the *degree of necessariness of association of that mark with a single object.* 2 J. Wigmore, Evidence § 411, p. 385 (3d ed. 1940) (emphasis in original) . . . . But it must be understood that [the term "mark" refers] to the combination of circumstances offered as a mark, and not to any one circumstance going with others to make it up. *Id.* at § 412, pp. 386–87.

them as the handiwork of the same individual." 492 F.2d 1154.[17] The question before us is whether the evidence of other crimes introduced in this case meets that standard.

In order to support its argument that the evidence of the Pennsylvania robbery was properly admitted, the government points to the following similarities between the charged and the uncharged crime: (1) both crimes were bank robberies, (2) perpetrated by Coffie and Myers, (3) between two and three o'clock in the afternoon. In both robberies the victimized bank was (4) located on the outskirts of a town, (5) adjacent to a major highway. In both robberies the participants (6) used a revolver, (7) furnished their own bag for carrying off the proceeds, and wore (8) gloves and (9) masks crudely fashioned from nylon stockings. Finally, (10), in one of the banks, two women employees were present; in the other, five women employees were present. The government's position is that these ten common features give the evidence of the other crime sufficient probative value to outweigh the prejudice its admission must inevitably cause Myers.

There are several flaws in this analysis. To begin with, the assertion that Coffie and Myers robbed both banks begs the question which the evidence of the uncharged crime is supposed to help us to answer: whether Myers perpetrated the Florida robbery. Moreover, the number and gender of employees present could only be a circumstance controlled by the robbers if they timed the robbery to coincide with the presence of such employees. Thus the time of the robbery and the presence of only a few female employees really constitute only a single common feature. Equally significant is the fact that each of the eight remaining similarities is a common component of armed bank robberies.[18] When they are considered as a whole, the combination still lacks distinction. The presence of a marked dissimilarity—that the charged crime was perpetrated by a lone gunman, while the uncharged crime was committed by two armed men—further undermines the force of the inference of identity. An early afternoon robbery of an outlying bank situated on a highway, by revolver-armed robbers wearing gloves and stocking masks, and carrying a bag for the loot, is not such an unusual crime that it tends to prove that one of the two individuals involved must have been the single bandit in a similar prior robbery. The probative value of this evidence does not outweigh its substantial prejudicial effect. It was improperly admitted.

The government's reliance upon our decision in *United States v. Cavallino, supra,* is misplaced. In *Cavallino,* evidence of three previous bank robberies was held to have been properly admitted, to prove, on the same theory relied upon in this case, that the defendant had committed a fourth. We noted that the four robberies were similar in the following respects:

[1] Each robbery victim was a bank.
[2]. The first robbery was committed, February 9, by Cavallino, Ames and Washburn; the second, February 27, by Cavallino and Ames; the third, March 20, by Cavallino, Ames and Washburn. The evidence that Ames left Ormond Beach two days after the Florida robbery, having meanwhile thrown into a lake the items heretofore mentioned, and was arrested in Massachusetts four days after the robbery with more than $27,000 in cash, including 37 identifiable bills taken in the robbery, and more than 100 automobile master keys, one of which fit the stolen Pontiac, points to Ames as one of the robbers. The evidence also indicates that there were two or, possibly, three involved, if one remained with a "cool" getaway car.
[3]. Before each of the former robberies the participants had a meeting. Before the Florida robbery Cavallino, Ames and

---

17. *See* E. Cleary, McCormick on Evidence § 190, p. 449 (Rev. ed. 1972) ("The device used must be so unusual and distinctive as to be like a signature.")

18. Indeed, counsel for the government conceded during oral argument that feature (8), the wearing of gloves, is an example of a similarity that proves nothing because it is so common.

Washburn had several meetings and were absent from their abodes, and apparently together, from about 7:30 A.M. the day before the Florida robbery until after their return to Ames' apartment about ten hours after the robbery.

[4]. A stolen or "hot" car of General Motors manufacture was used to approach and to leave the bank in all instances.

[5]. A rented or "cool" car (or cars), obtained at an airport rental agency, was used after the "hot" car was abandoned in each of the former crimes. In the Florida robbery the "hot" car was soon abandoned. Cavallino, accompanied by Ames, had left Ames' apartment in his airport rental car the day before the robbery and returned there about 8:30 P.M. on the day of the Florida robbery. [6]. In all four crimes, the "hot" car was parked at the bank's rear door and the robbers entered and departed by the rear door. [7]. All four robberies were committed between 9 A.M. and 11:30 A.M. [8] In all four crimes one of the robbers was armed with a revolver and in the last Louisiana robbery and the Florida robbery another robber was armed with a sawed-off shotgun. [9]. Each of the four robberies was quick and apparently timed with precision. 498 F.2d at 1207.

In addition, in *Cavallino* (1) there were three uncharged crimes similar to the charged crime, not merely one, (2) the defendant had confessed to the three uncharged robberies and stated that, in his opinion, 9:00 to 11:00 a. m. was the best time to rob a bank, (see [7]), and that an airport rental agency was the best place to rent a "cool" car (see [5]), and (3) a person who had participated with the defendant in each of the three previous robberies (Ames)

had been persuasively linked to the fourth.[19] For these reasons *Cavallino* does not control our decision here.

Nor does *United States v. Maestas, supra,* dictate a different result. In *Maestas* the defendant stood accused of two counts of causing forged checks to be transported in interstate commerce, in violation of 18 U.S. C.A. § 2314 (1970). There evidence of seven similar transactions involving the cashing of forged checks was introduced to prove opportunity, preparation, and identity. We held that the evidence was admissible to bolster the government's case. Although there were a number of features common to the charged and the uncharged offenses— such as the facts that all of the counterfeited checks were made payable to women, and that all were cashed in split-deposit transactions in which the payee deposited a portion of the proceeds and received the remainder in cash—there were two very distinctive common features that gave the evidence of the other acts an unusually high probative value. First, in five of the seven similar transactions the defendant's fingerprints were found on the forged check, the deposit slip, or both, just as they had been in at least one, and possibly both, of the charged offenses. Second, in each instance of forgery, including both of the charged offenses and all seven of the similar acts, the checks themselves were identical. The government also introduced evidence indicating that the checks and counterfeited identification materials had been sent to the defendant from a print shop in Chicago where friends of hers worked, and produced an admittedly genuine photograph of the defendant leaving a Denver bank after cashing a forged check identical to those involved in the charged offenses and the other six similar transactions.

**19.** In *People v. Haston, supra,* the California Supreme Court attached particular significance to the involvement in the charged offense of a person with whom the defendant had collaborated in committing the uncharged offenses. It stated:

It is clear that McDowell's presence, unlike the other features common to the charged and uncharged offenses, is a mark whose distinctive nature tends to differentiate those

offenses from other armed robberies. There is only one Donald McDowell, and his conjunction with defendant in earlier robberies, together with his admitted participation in the robberies charged, supports the inference that defendant and not some other person was his accomplice in those charged offenses.

69 Cal.2d at 249, 70 Cal.Rptr. at 430, 444 P.2d at 102.

In *Maestas,* the inference of identity generated by the evidence of the seven similar acts was overwhelming. The common features pointed convincingly to the defendant as the perpetrator of the charged offenses. Myers case differs markedly.

The admission of evidence indicating that Myers had previously been convicted of armed bank robbery was reversible error.

### Flight Instruction

Myers also argues that the district court erred in instructing the jury concerning the proper use of evidence indicating that he fled from FBI agents on two occasions (one in Florida, the other in California) subsequent to the commission of the robbery. He does not ask us to approve or disapprove of the charge as an abstract statement of legal principles; instead he contends that the instruction should not have been given because there was insufficient evidence to support it. Because the issue is likely to recur on retrial, we address it now. *See United States v. Scanland,* 495 F.2d 1104, 1108 (5th Cir. 1974).

The complete text of the challenged instruction is as follows:

The intentional flight of a defendant immediately after the commission of a crime or after he is accused of a crime that has been committed is not, of course, sufficient evidence in itself to establish his guilt, but is a fact which, if proved, may be considered by the jury in the light of all other evidence in the case in determining the guilt or innocence, whether or not evidence of flight shows a consciousness of guilt and the significance to be attached to any such evidence are matters exclusively within the province of the jury. In considering any evidence of flight, the jury should consider the motive which prompted it.

The only account of the circumstances surrounding the Florida incident was supplied by Debra Dunn, whose apartment Myers shared for three to four months preceding the robbery. She testified that during the weeks following the robbery Special Agents Shields and Miller of the FBI tried to contact Myers through her on several occasions, but he was not at home when they called. According to Dunn, the only reason Shields and Miller gave for wanting to contact Myers was to determine the whereabouts of Coffie. When she reported these attempts to Myers he indicated that he did not wish to speak with the agents.

Approximately three weeks after the robbery, Myers called Dunn on the telephone and asked her to bring some of his clothing to the Fashion Square Mall in Orlando, Florida. After she arrived at the shopping center she noticed Agents Shields and Miller in plain clothes waiting nearby. When they asked her whether she intended to meet Myers, she lied, but they guessed her true purpose. A few minutes later they spotted him some distance off, and after one of Dunn's daughters revealed Myers' identity, Agent Miller ran toward him without identifying himself in any way. Myers bolted into the shopping center and disappeared.

At some time during the three weeks following this incident, Myers left Florida and traveled to Pennsylvania. Although it is known that he was in Warren, Pennsylvania, on July 29, 1974, and Johns' testimony indicates that he remained there for approximately two weeks, the date on which he left Florida cannot be determined from the record.

Special Agent Hanlon of the FBI testified at the second trial concerning the circumstances surrounding the arrest of Coffie and Myers in Laguna Beach, California, which occurred on August 12, 1974, approximately two months after the Florida robbery. The agents decided to close in while Coffie and Myers were riding a motorcycle. The sequence of events culminating in their arrest began when Special Agent Callie, who was approaching Coffie and Myers from the opposite direction in an unmarked car, suddenly crossed over into their lane of travel and drove straight at them. Coffie swerved but was unable to avoid a slight collision. The motorcycle came to a stop approximately one hundred feet past Callie's car. Immediately thereafter, Hanlon,

who was not in uniform and had been following Coffie and Myers in another unmarked car, pulled up alongside the motorcycle. He testified that as he arrived Coffie moved "about three feet" to the front of the motorcycle and that Myers moved a similar distance to the rear. Hanlon then emerged from his car with his gun drawn, identified himself as an FBI agent, and informed Coffie and Myers that they were under arrest. He also testified that he believed that Coffie and Myers were beginning to flee at the time of his arrival "because they were—I would say approximately fifty feet from where they alighted and moving—one was moving in one direction and one was moving in the other direction and my own interpretation at this point would be that they were moving away from the bike."

On cross-examination the defense introduced portions of Hanlon's testimony from Myers' trial on the Pennsylvania charges which are inconsistent with the account of the arrest outlined above. During the Pennsylvania trial Hanlon had testified that when he arrived on the scene "Mr. Coffie was putting the stand down so that the bike wouldn't fall over." And when asked whether Coffie or Myers attempted to flee, he had responded: "I was not aware that anyone did."

The only other testimony concerning the circumstance of the arrest was furnished by Coffie. He merely stated that when he swerved to avoid the oncoming car he had no idea that it contained police or federal agents.

▇ Analytically, flight is an admission by conduct. E. Cleary McCormick on Evidence § 271, p. 655 (rev. ed. 1972). Its probative value as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. *See generally Miller v. United States,* 116 U.S.App.D.C. 45, 48, 320 F.2d 767, 770 (1963); 1 J. Wigmore, Evidence § 173, p. 632 (3d ed. 1940). The use of evidence of flight has been criticized on the grounds that the second and fourth inferences are not supported by common experience and it is widely acknowledged that evidence of flight or related conduct is "only marginally probative as to the ultimate issue of guilt or innocence." *United States v. Robinson,* 154 U.S.App. D.C. 265, 273, 475 F.2d 376, 384 (1973). *See Wong Sun v. United States,* 371 U.S. 471, 483–84 n. 10, 83 S.Ct. 407, 415–16, 9 L.Ed.2d 441, 452–453 (1963); *United States v. Register,* 496 F.2d 1072 at 1077 (5 Cir.); *Vick v. United States,* 216 F.2d 228, 232–33 (5th Cir. 1954); *United States v. Craig,* 522 F.2d 29, 30 (6th Cir. 1975).

▇ Nevertheless, in *United States v. Ballard,* 423 F.2d 127 (5th Cir. 1970), we stated:

It is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself. *Id.* at 133.

Quoting 2 J. Wigmore, Evidence § 276, p. 111 (3d ed. 1940). *See generally Allen v. United States,* 164 U.S. 492, 500–501, 17 S.Ct. 154, 157, 41 L.Ed. 528, 530–531 (1896); *United States v. Clark,* 506 F.2d 416, 418 (5th Cir. 1974), *cert. denied,* 421 U.S. 967, 95 S.Ct. 1957, 44 L.Ed.2d 454 (1975); *United States v. Register,* 496 F.2d 1072, 1077–78 (5th Cir. 1974), *cert. denied sub nom.; Cochran v. United States* and *Hornsby v. United States,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 819 (1975).

▇ Applying these principles to the California incident initially, it is apparent that the events do not support the first of the four inferences. The only evidence that Myers or Coffie attempted to flee from the arresting officers was furnished by Agent Hanlon. But Hanlon's testimony was inconclusive. He first stated that Myers and Coffie were three feet from the motorcycle; then that they were fifty feet from it. In

addition, Hanlon's testimony below conflicted with statements he made at Myers' trial on the Pennsylvania charges. There he testified that neither Myers nor Coffie had attempted to flee. Indeed, it seems unlikely that they would get off of the motorcycle if their purpose was to avoid capture. For a jury to find that Myers fled from federal agents prior to his arrest in California would require conjecture and speculation. It was error to instruct the jury that they could infer consciousness of guilt from an alleged flight which was without support in the record. *Cf. United States v. Torrence*, 480 F.2d 564 (5th Cir. 1973).

The evidentiary basis for the instruction regarding the California incident is also deficient in another respect. Even assuming that Myers did attempt to flee, giving a flight instruction would still be improper because the third inference upon which the probative value of flight as circumstantial evidence of guilt depends, from consciousness of guilt to consciousness of guilt concerning the crime charged, cannot be drawn. Since it is known that Myers committed an armed bank robbery in Pennsylvania between the date on which the Florida robbery occurred and the date of his arrest in California, the hypothesis that he fled solely because he felt guilty about the Pennsylvania robbery cannot be ruled out. The theory under which evidence of flight is admitted presumes that consciousness of guilt concerning the Pennsylvania robbery could be a sufficient cause of flight. Without knowing whether Myers committed the Florida robbery it is impossible to say whether the California flight resulted from feelings of guilt attributable to the Florida and Pennsylvania robberies or from consciousness of guilt about the Pennsylvania robbery alone. Therefore, even if Myers did flee from the federal agents in California, no inference that he is guilty of the Florida robbery is possible, and it was error for this reason also to instruct the jury that they could draw such an inference. *Cf. State v. Whitney*, 43 Idaho 745, 254 P. 525

(1927) (attempted escape by prisoner awaiting trial for two district offenses not relevant to show that he is guilty of either); 2 P. Herrick, Underhill's Criminal Evidence § 373, p. 923 (5th ed. 1956).

■ Because of the inherent unreliability of evidence of flight, and the danger of prejudice its use may entail, *see* E. Cleary, McCormick on Evidence § 271, p. 655 (rev. ed. 1972), a flight instruction is improper unless the evidence is sufficient to furnish reasonable support for all four of the necessary inferences. *See Morris v. United States*, 326 F.2d 192, 195 (9th Cir. 1963) (flight instruction improper where the evidence does not reasonably support the inference that the defendant fled); *State v. Bruton*, 66 Wash.2d 111, 112–114, 401 P.2d 340, 341–42 (1965); E. Cleary, McCormick on Evidence § 271 p. 655 n.3 (rev. ed. 1972). The evidence relating to the California incident did not meet that standard.[20]

■ Turning next to the Florida incident, the evidence, though somewhat stronger, was likewise insufficient to support the flight instruction given. The version of Myers' conduct in Florida most favorable to the prosecution's case is that federal agents were unable to contact him at his usual place of residence for three weeks after the robbery, that he had his girlfriend bring his clothing from her house to a rendezvous point in a shopping center, that he fled when an unidentified man ran toward him at the shopping center, and that he left the state between three and six weeks after the date of the robbery. This evidence does not demonstrate intentional flight "*immediately* after the commission of a crime or after [accusation] of a crime" (emphasis added) as the instruction, by its own terms, requires. *Compare United States v. Rowan*, 518 F.2d 685, 691 (6th Cir. 1975) (flight instruction not improper where defendant left the community within 36 hours of the time at which the charged crime was committed) *with United States v. White*, 488 F.2d 660, 662 (8th Cir. 1973) (instruction improper where five months

---

**20.** The prejudicial effect of Hanlon's testimony so far outweighs its probative value that it should not be admitted on retrial. *See* Fed.R. Evid. 403.

had elapsed between the date of the charged offense and the attempted arrest). *See generally United States v. Register, supra; United States v. Deas,* 413 F.2d 1371 (5th Cir. 1969); *Monnette v. United States,* 299 F.2d 847 (5th Cir. 1962). The immediacy requirement is important. It is the instinctive or impulsive character of the defendant's behavior, like flinching, that indicates fear of apprehension and gives evidence of flight such trustworthiness as it possesses. *See generally* Hutchins & Slesinger, Some Observations on the Law of Evidence—Consciousness of Guilt, 77 U.Pa. L.Rev. 725, 734–35 (1929). The more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other than feelings of guilt concerning that offense. Under the evidence adduced it was error to instruct the jury that they could infer from the Florida incident that Myers committed the crime with which he is charged.

During oral argument, counsel for the government conceded that the evidence in this case was so evenly balanced that if the district court erred in making one of the three rulings challenged in this appeal, the error could not be viewed as harmless. Since we hold that the district court abused his discretion when it denied the defendant's motion to strike the testimony of the undisclosed alibi rebuttal witnesses, and when he admitted evidence indicating that Myers had committed a crime not charged in the indictment, it follows that judgment and conviction appealed from must be

REVERSED.