**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Wayne BARNHART,**
**Defendant–Appellant.**

No. 89–1122
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

Nov. 27, 1989.

---

**5.** These included Burke, Brazel, Burns, Colvin and Keys.

Michael A. Hummert, (Court Appointed), Dallas, Tex., for defendant-appellant.

Wayne L. Barnhart, Big Spring, Tex., pro se.

Marvin Collins, U.S. Atty., Dallas, Tex., Merv Hamburg, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before GEE, DAVIS, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Wayne Barnhart was sentenced to 18 months imprisonment upon being convicted for making false declarations before a grand jury, in violation of 18 U.S.C. § 1623. On appeal, he contests the sufficiency of the indictment; the propriety of admitting evidence and jury instructions relating to "flight"; the sufficiency of the evidence; and the application of the sentencing guidelines. We find no error in his conviction or sentence and accordingly affirm.

## I. BACKGROUND

A detailed recitation of the evidence is necessary to a discussion of Barnhart's contentions.

In connection with a federal task force investigation of fraud in the savings and loan industry in Texas, Wayne Barnhart

was contacted by telephone in early June of 1988 by Federal Bureau of Investigation ("FBI") agent John Dillon. Dillon asked Barnhart if he was familiar with a $19,300,000 loan from three Texas financial institutions, Meridian Savings, Security Savings and People Savings Association, which involved property in Corpus Christi, Texas, and a company known as Omni Interest (referred to generally as the "Omni–Corpus Christi transaction"). Barnhart responded that he was familiar with the transaction. Dillon requested a grand jury subpoena for Barnhart to testify on July 6, 1988.

On that date, prior to Barnhart's testimony, Dillon questioned Barnhart as to details of the transaction under investigation. When Barnhart would not provide the requested information Dillon asked why Barnhart was not cooperating. According to Dillon's testimony, Barnhart responded that an official of the Federal Savings & Loan Insurance Corporation ("FSLIC") had told him that he should "get dumb" regarding any information he was to provide the grand jury or the FBI. In an attempt to elicit some useful information from Barnhart, Dillon outlined what the investigation had uncovered concerning the transaction. Barnhart said to Dillon "there is only one thing wrong with what you have told me and with a little bit more work you should be able to figure that out." When asked for the missing information, Barnhart gave no answer. Barnhart's testimony before the grand jury reflected his reluctance to provide the information requested.

When Agent Dillon told Assistant U.S. Attorney David Jarvis about Barnhart's "get dumb" comment, Barnhart was subpoenaed for a second appearance before the grand jury. The second subpoena was to be served by FBI Special Agent John Wallace who was not associated with the investigation. Wallace was assigned to the FBI office in Waco, Texas, which was close to Barnhart's residence.

When Barnhart came to Wallace's office on July 12 to pick up the subpoena he asked Wallace why he was being called as a witness for a second time. Wallace told Barnhart some common reasons based upon his own experience and at that point Barnhart became "very nervous." Barnhart began to discuss the investigation even though Wallace had said that his role was merely to serve the subpoena. Barnhart said that the investigation of the Omni–Corpus Christi transaction "was really going the wrong way." Barnhart remarked that the FBI had thrown out a large net, but was only catching the small fish while allowing the big fish to get away.

Barnhart told Wallace that while vacationing in Mexico he had received a telephone call from a FSLIC official who had advised Barnhart to "get dumb" when he appeared before the grant jury. When asked by Wallace to identify the FSLIC official Barnhart clasped his hands, leaned back in his chair and said, "I've just got a real bad memory about those things. I just can't remember."

Barnhart then said that while working in the banking industry he became aware of two instances where large amounts of money ($50,000 and $1,000,000) had "slipped through the cracks." Wallace asked for details and Barnhart responded by again clasping his hands looking up at the ceiling, and with a "smirk on his face" he contended that he had a loss of memory.

Barnhart related to Wallace that $37 million was involved in the transaction under investigation. Barnhart told Wallace that he did not trust the government to maintain his confidentiality if he became an informant. When Wallace gave Barnhart a copy of the subpoena, Barnhart stated that if required to go before the grand jury a second time he would adhere to his previous testimony and continue to "get dumb" as he had been advised by a "close personal friend" in the FSLIC. Agent Wallace related to agent Dillon the substance of this conversation including the intentional ignorance or "playing dumb" remarks.

On July 19 Barnhart telephoned agent Wallace seeking his advice as to his upcoming appearance. Wallace told him to go before the grand jury and tell the truth. Barnhart remarked that "Bogota looked real good this time of year." Barnhart

stated that if required to testify he would continue to "get dumb in this whole matter." Barnhart wanted to meet Wallace at a local restaurant. Wallace, not being involved in the investigation, asked Barnhart to call back after he had sought advice from agent Dillon. Wallace was told that Barnhart was expected to give his information to the grand jury rather than the FBI. Barnhart did not call back.

On July 21 Barnhart met with government attorneys Jarvis and Dillon prior to his grand jury appearance. They advised him that he was regarded as merely a witness rather than a target of the investigation, and that he should tell the truth. Barnhart stated that he knew where to look for information regarding the transaction in question and that he knew how the individuals involved operated.

Jarvis questioned Barnhart before the grand jury as to his first conversation with Dillon on the telephone, and whether he initially told Dillon that he was familiar with the details of the transaction. Barnhart recalled the conversation and that he had told Dillon that he "was basically familiar with the transaction." Barnhart was asked whether he remembered telling Dillon that the reason he suddenly changed his position, from remembering details of the transaction to being unwilling to disclose those details, was due to someone at the FSLIC advising him to "get dumb" as to any information he might provide. Barnhart replied, "I don't recall that. I may have said that to him, but I do not recall it."

Barnhart was asked whether he remembered telling agent Wallace on July 12 about the same "getting dumb" strategy. Barnhart said that he "didn't recall that conversation." After again warning Barnhart about the consequences of false testimony, Jarvis asked Barnhart if he remembered a statement he made to Wallace on July 19, two days prior to his grand jury appearance that a " 'friend at FSLIC told me to get dumb,' " and that this was a longtime friend who reiterated this advice three or four times. Barnhart replied "No sir." Barnhart stated that he did not recall whether an FSLIC official had ever advised him to "get dumb" while testifying before the grand jury.

Jarvis asked, "You told two different agents on three different occasions that a FSLIC examiner told you to get dumb, you just can't explain that, can you?" Barnhart replied, "No sir." Jarvis asked, "They just kind of grabbed that out of the blue?" Barnhart replied, "Yes sir." Barnhart persisted after repeated questioning that he didn't remember any of the "get dumb" remarks.

After the testimony, Jarvis told Barnhart that he believed Barnhart had perjured himself. Jarvis asked Barnhart to identify the FSLIC examiner with whom he had spoken. Barnhart replied that he had already mentioned his name. Recalling that the name of Bill Strickland, an examiner for the FSLIC, had arisen during his grand jury testimony, Jarvis asked Barnhart whether Strickland was the one who had given the "get dumb" advice. Barnhart did not respond.

When Barnhart was eventually arrested for perjury on September 22, after he had failed to surrender as directed on September 19, Barnhart stated to his mother at the FBI office, "I tried to get invisible. I tried to run, but I couldn't run fast enough or far enough."

After a jury trial, Barnhart was convicted of making declarations at a grand jury proceeding in violation of 18 U.S.C. § 1623.

## II. SUFFICIENCY OF THE INDICTMENT

■ Barnhart contends that indictment against him was insufficient for the reason that, although it set forth the precise falsehood alleged, it failed to specify the factual basis for the alleged falsity of Barnhart's testimony to permit a jury to determine the verity of the testimony and to allow meaningful judicial review of the alleged falsehoods (citing *United States v. Slawik*, 548 F.2d 75 (3rd Cir.1977)). Barnhart thus contends that the district court erred in denying his motion to quash the indictment.

This Court has expressly rejected the *Slawik* requirement that the indictment state the factual basis for the alleged false statements. *United States v. Oberski*, 734 F.2d 1034, 1035 n. 1 (5th Cir.1984), *cert. denied*, 469 U.S. 1113, 105 S.Ct. 797, 83 L.Ed.2d 790 (1985); *United States v. Crippen*, 579 F.2d 340, 341–42 (5th Cir.1978). A perjury indictment need not allege in detail the factual proof that will be relied on to support the charges. *Crippen*, 579 F.2d 341–42. The thirteen-page indictment in the instant case states the essential elements of the § 1623 offense, enabling Barnhart to prepare his defense and to invoke the double jeopardy clause in any subsequent proceeding for the same offense. *Oberski*, 734 F.2d at 1035. The indictment set forth that on July 21, 1981, in the Northern District of Texas, Barnhart testified under oath before a grand jury which was investigating in part whether Barnhart had knowledge of violations of federal criminal laws. The indictment further specified that it was material to the investigation to determine whether Barnhart had been told to "get dumb" by a FSLIC employee and whether, in fact, he was given such advice. The time and place of the alleged false, material declarations were set forth in detail. The indictment was legally sufficient. The district court did not err in denying the motion to quash.

### III. "FLIGHT" EVIDENCE AND INSTRUCTION

Barnhart contends that the district court erred in allowing his two admissions concerning "flight," that "Bogota looked real good this time of year," and his statement to his mother after arrest that he tried to get "invisible," and that he "tried to run" but he "couldn't run fast enough or far enough." He further contends that the district court erred in its instruction to the jury allowing it to consider those statements in light of all the other evidence to determine guilt.

Barnhart first argues that the Bogota statement and the statement to his mother were not themselves evidence of flight or accompanied by other evidence of flight,

and thus not admissible. However, the statement about the desirability of going to Bogota was relevant not only as reflecting his desire to flee, but was relevant as reflecting his state of mind, his intent and his knowledge prior to going before the grand jury a second time.

The Bogota statement was clearly relevant to his knowledge of giving false testimony and weighs against his contention before the grand jury that his memory was poor. The comment about trying to become "invisible" and trying to "run" is not "ambiguous" as Barnhart argues. These statements were relevant and admissible as admissions against interest. Barnhart has not persuasively shown that the possible prejudice to him from this evidence outweighed its high probative value.

Barnhart argues that a flight instruction to the jury was improper because the evidence did not support what he contends are the four necessary inferences for such an instruction. Those inferences are: (1) from the defendant's behavior to flight, (2) from flight to consciousness of guilt, (3) from consciousness of guilt to consciousness of guilt concerning the crime charged, and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. *See United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977).

Evidence of flight is generally admissible to prove consciousness of guilt. *United States v. Kalish*, 690 F.2d 1144, 1156 (5th Cir.1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983); *Myers*, 550 F.2d at 1049. The holding of *Myers* is that a flight instruction to the jury is erroneous where allegations of flight are without support in the record. *Kalish*, 690 F.2d at 1156. In *Myers*, an FBI agent testified that he believed suspects who had parked a motorcycle were "beginning to flee at the time of his arrival." *Myers*, 550 F.2d at 1049. However, because there was no other evidence of flight and because the agent had previously testified that he was not "aware" that anyone had attempted to flee, this Court found that an instruction on flight was erroneous.

In this case, there is no direct or circumstantial evidence supporting the trial court's instruction that evidence of "intentional flight" of a defendant "immediately after he is accused of a crime" may be relevant to guilt. It is true that Barnhart made flippant remarks about "Bogota" and about trying to run, but not far enough. But he turned himself in to the Waco FBI office two days after being notified that his arrest warrant had been issued. Barnhart's comments alone, unsupported by evidence of actual flight, cannot sustain the "flight" instruction by the trial court. Nevertheless, the trial court's error in delivering this jury instruction was harmless, for two reasons. First, the evidence of Barnhart's statements was clearly admissible against him on grounds other than flight. Second, his guilt so abundantly appears from the testimony in the record that the error was harmless. Fed.R.Crim.P. 52; *see United States v. Lemire,* 720 F.2d 1327, 1339 (D.C.Cir.1983).

## IV. SUFFICIENCY OF THE INDICTMENT

To obtain a § 1623 conviction for perjury, the government must prove that the defendant's statements were material, that they were false, and that, at the time they were made, the defendant did not believe them to be true. *United States v. Nixon,* 816 F.2d 1022, 1029 (5th Cir.1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988). On appellate review, evidence as to the issues other than materiality is viewed in a light that is most favorable to the government, with all reasonable inferences and credibility choices made in support of the jury's verdict. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704 (1942). The standard is the same whether the evidence is direct or circumstantial. *Id.* The reviewing court must affirm if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).

Barnhart urges only that the evidence was insufficient to demonstrate his knowledge of the falsity of his particular answers. This contention is without merit. The government could prove a false claim of a lack of recall through circumstantial evidence of any sort. *See United States v. Abrams,* 568 F.2d 411, 419 (5th Cir.1978), *cert. denied,* 437 U.S. 903, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978). The jury could reasonably have concluded that Barnhart knew the falsity of his answers based upon the testimony of the two FBI agents who testified in detail about Barnhart's numerous references to the advice to "get dumb," the memorable nature of such an occurrence, the proximity of those statements to the grand jury testimony, the testimony of the agents as to Barnhart's other knowledge of the transaction under investigation and as to Barnhart's attitude toward the investigation, the testimony of the agents and the government attorney regarding Barnhart's demeanor, the transcript of the grand jury testimony, and the audio tape of the grand jury testimony. Unlike the situation in *United States v. Clizer,* 464 F.2d 121, 125 (9th Cir.1972), *cert. denied,* 409 U.S. 1086, 93 S.Ct. 697, 34 L.Ed.2d 673 (1972), relied on by Barnhart, there was more than marginal testimony to prove knowledge of falsity. The jury in the instant case could reasonably have found that Barnhart knowingly testified falsely.

## V. SECTION 2J1.3(b)(2) OF SENTENCING GUIDELINES

The presentence report recommended a three-level increase in the offense level computation for the specific offense characteristic of substantial interference with the administration of justice based upon § 2J1.3(b)(2) of the sentencing guidelines. That section provides, "If the perjury or subornation of perjury resulted in substantial interference with the administration of justice, increase by 3 levels." The "Application Notes" to this section elaborate that:

> "Substantial interference with the administration of justice" *includes* a premature or improper termination of a felony investigation, an indictment or verdict based upon perjury, false testimony, or

other false evidence, or the unnecessary expenditure of substantial governmental or court resources.

Section 2J1.3, Application Note 1 (emphasis added).

 Barnhart challenges as clearly erroneous the finding of the district court at sentencing that his actions substantially interfered with the administration of justice by interfering with the investigation of the grand jury and the FBI. In reviewing this appeal this Court will uphold a sentence unless the sentence was "imposed in violation of law," or was "imposed as a result of an incorrect application of the sentencing guidelines," or was "outside the range of the applicable sentencing guideline, and is unreasonable." 18 U.S.C. § 3742(e) and (f). The reviewing court shall accept the findings of fact of the district court unless they are clearly erroneous. 18 U.S.C. § 3742(e); *see, e.g., United States v. Buenrostro,* 868 F.2d 135, 136–37 (5th Cir.1989).

As to the finding of substantial interference with the administration of justice, which Barnhart contested prior to sentencing, the district court specifically adopted as findings of fact an addendum to the presentence report, written by probation officer Lanny E. Hassell, which provided that:

> because the defendant was uncooperative and provided less than truthful information to the grand jury, the FBI's investigation of the case in question was hindered as well as the investigation of the FSLIC representative who advised Barnhart to "get dumb."

The district court also found substantial interference from the "evidence at trial." Although Barnhart is correct that there were no findings as to the "unnecessary expenditure of substantial government or court resources," which would be one method of establishing a factual basis for this increase, he has not made any showing that the district court's adopted findings as to the hindering of the investigations were

clearly erroneous or that the court erred in applying this increase.[1]

For the foregoing reasons, the judgment of the trial court is *AFFIRMED.*

---

**1.** In the instant case there is no question that the alleged interference with justice occurred as a result of the crime charged, therefore, *United* *States v. Leeper,* 886 F.2d 293 (11th Cir.1989), is not applicable.