**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David LUNA;  Robert Todd Torres;
Richard Aereleo Pina, Defendants–
Appellants.**

**Nos. 93–10035, 93–10036 and 93–10059.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 7, 1994.

Decided April 5, 1994.

As Amended May 4, 1994.

875

James R. Homola, Fresno, CA, for defendant-appellant David Luna.

Francine Zepeda, Fresno, CA, for defendant-appellant Robert Todd Torres.

Barry F. Nix, Fresno, CA, for defendant-appellant Richard Pina.

Jonathan B. Conklin, Asst. U.S. Atty., Fresno, CA, for plaintiff-appellee.

Before: FLETCHER, KOZINSKI and TROTT, Circuit Judges.

FLETCHER, Circuit Judge:

Defendants Richard Pina and Robert Todd Torres were convicted of robbing the Western Financial Savings Bank in Fresno, California; Pina, Torres, and David Luna were convicted of robbing the Bank of America, also in Fresno. Evidence of two subsequent Oregon bank robberies for which Luna and Pina were alleged to have been responsible was admitted, under Fed.R.Evid. 404(b), to prove the identity of the Fresno bank robbers.

Luna and Pina contend that the district court erred in admitting the evidence of the two Oregon bank robberies. We agree, and reverse Luna's and Pina's convictions on that basis. We reject Pina's and Torres' challenge to the sufficiency of the evidence, and affirm Torres' conviction. We also conclude that the district court correctly adjusted Torres' offense level upward for reckless endangerment and for infliction of bodily injury.

**FACTS**

A. *The First Charged Robbery: Western Financial Savings Bank*

On March 12, 1992, the Western Financial Savings Bank, in Fresno, was robbed by two gunmen. The robbery was performed "takeover style": after a loud entry, the robbers ordered all of the bank employees and customers, at gunpoint, to get on the floor. One of the robbers then jumped over the counter, made the tellers open their drawers, and began emptying money into a pillowcase-like bag. The other robber stood guard on top of

the counter. Two of the tellers were grabbed or pulled by the hair. The robbers were also verbally abusive to the tellers.

The robbers were dressed in dark sweatpants and sweatshirts, with nylon stocking masks over their heads. At least one robber wore gloves, which according to one witness were not surgical gloves. One or both of the robbers wore baseball hats.

After three or four minutes, the robbers left the bank, yelling, as they went out, "this is Crips 107." The robbers were observed by a gardener, who was standing outside the bank raking flower beds; he watched them run by with their guns and their bag of money, one robber shedding his stocking mask as he ran. Baseball hats were later found in the hallway in front of the bank. The robbers jumped into a car which was then driven off, probably by a third person.

After the robbery, one victim was able to make a positive identification of Torres from a police photo spread, and again identified Torres in court. Probation officers identified both Torres and Pina from bank surveillance photographs.

B. *The Second Charged Robbery: Bank of America*

On March 23, 1992, between 10:30 and 11:00 a.m., three men, at least two of them armed, robbed the Bank of America in Fresno. This robbery also was committed takeover style; when the men burst into the bank, they shouted out, according to different witnesses, "Everybody down," or "This is a robbery," or "This is a holdup. Don't move." All three robbers jumped over the counters; they pulled the cash cans out of the tellers' drawers and threw them onto the floor. They loaded the money into bags described variously as white bank bags, canvas bags, beige bags, and pillowcases. The robbers used foul language with the tellers, but did not physically abuse anybody until, on the way out, one of them struck the bank manager in the face.

The robbers were dressed in dark sweatpants and sweatshirts. Two wore ski masks; one wore a nylon stocking mask. At least one robber wore surgical gloves. One of the bank tellers saw a tattoo on the left side of the neck of one of the robbers. The teller testified that the tattoo was consistent with a tattoo that Torres had on the left side of his neck at the time of trial.

After the robbery, at 11:45 a.m., Deputy Elerick of the Fresno County Sheriff's Department recognized a car he had stopped on March 11, 1992. Elerick also recognized the occupants from the previous stop: the driver was Luna and one of the passengers was Pina. Elerick followed the car; after it ran three stop signs, he attempted to make a vehicle stop. Rather than pulling over, however, the car stopped in the middle of the street. Elerick approached the car, but after seeing Luna reach down toward the floorboard, ran back toward his own vehicle. The car started to move again; Elerick chased it for a short distance; the car stopped, and three persons jumped out and fled. The car, which was still running, rolled over the curb and then stopped beneath a tree. The third person who jumped from the car, according to Elerick, was an Hispanic male in his late teens or early twenties, between 5'5" and 5'9", and weighing between 130 and 150 lbs.

Inside the car, officers found a revolver later discovered to have one of Torres' fingerprints on it. The customer service manager at the Bank of America testified that this revolver was similar to the gun one of the robbers had brandished. Also in the car, the officers found a semiautomatic handgun (in the area where Luna had been reaching), a bag of surgical gloves, and several torn-out yellow pages from a phone book, listing financial institutions. Outside the car, police discovered an L.A. Kings baseball hat; "Crips 107" was written under the bill. Police also found a maroon sweatshirt near a house that the suspects had run past; witnesses from the bank identified it as similar to a sweatshirt one of the robbers had been wearing. Upon investigation, the police found that the car belonged to Pina's girlfriend.

C. *The First Uncharged Robbery: Security Pacific Bank*

On April 20, 1992, at approximately 11:00 a.m., two men burst through the doors of the

Security Pacific Bank, in Beaverton, Oregon, and ordered everyone inside to get down on the floor. One man remained in the lobby area with his gun drawn; the other jumped over the tellers' counter and forced the tellers to open their cash drawers and give him money. This robber had a bag which one witness said might have been a pillowcase and which other witnesses described as light, whitish, or beige. The robbers yelled profanities at the bank employees, and the robber behind the counter grabbed one teller by the arm and attempted to pick up another teller by his hair.

The robbers wore nylon stocking masks and were dressed in sweatshirts and sweatpants; the pants of one robber may have been blue, and his shirt may have been a lighter color. The robber who remained in the lobby wore a hat; the counter-jumper did not. The robbers wore gloves which may have been either cotton or surgical gloves.

Also on the morning of April 20, a witness in the vicinity saw a car speeding away from the bank; reddish-colored smoke that could have been from a dye packet was coming out of the car. The witness saw three persons in the car. One person was holding onto the roof of the car with a surgical-gloved hand, while throwing items out of the car with the other hand. Two of these items turned out to be a baseball hat and a woman's nylon stocking.

On that same day, half a mile from the bank, an FBI agent inspected an abandoned car which looked as if it had been stolen, and which had reddish dye stains in the interior. Money was scattered through the car. A semiautomatic handgun was also inside. The car had been left with its engine running.

Parole officers looking at bank surveillance photographs later identified the robbers as Pina and Luna. On April 24, a police officer stopped a car driven by a man named Jimmy Ray Vaughn. The two other people in the car gave the names of Paul Lopez and Ralph Rey, but were later identified as Pina and Luna. Luna was wearing a baseball hat and blue sweats.

## D. The Second Uncharged Robbery: Far West Savings Bank

At approximately 10:50 a.m. on April 28, 1992, two men wearing nylon stockings on their heads made a very loud entrance into the Far West Savings Bank in Hillsboro, Oregon. One of them brandished a gun. First one and then the other robber came over the tellers' counter. They forced a teller to open his drawer, and when he didn't give them enough money, pushed him and tossed him back and forth between them. They also took money from the purse of one of the women in the bank. They were verbally abusive. The robbers wore blue and red sweatsuits, and baseball hats. One robber wore gloves which a witness described as being "more like white cotton work gloves"; the other wore white gloves made of a material the witness did not recall. Tr. at 430.

Just before 11:00 a.m. that same day, Officer Sarrett of the Washington County Sheriff's Office learned that a bank robbery had taken place, and drove toward Hillsboro to try to find the robbers. On his way to town, he noticed that the driver of a car coming toward him was staring straight ahead without looking from side to side. His suspicions alerted, Sarrett turned around and followed. He turned on his overhead lights, and the car sped away from him. He lost it briefly and soon thereafter found it abandoned in the middle of the road, with the ignition on. A bystander (holding a pillowcase) told him that three men had fled from the car. Sarrett gave chase, but did not find the escapees.

Inside the abandoned car, officers later found a blue sweat shirt, a woman's purse, and a tall yellow bank bag from the Far West bank. Inside the bag was $3000. Three traffic citations in the glove compartment bore the name of Jimmy Ray Vaughn. Inside the bank, officers found an L.A. Kings baseball hat.

Also on April 28, 1992, three men, out of breath, dirty, and wet, appeared at the house of Lydia Caballero, in Cornelius, Oregon. One of the men, whom Caballero knew to be David Luna, had no shirt on. The other men were Pina and Vaughn; they asked for Candy, who shared the house with Caballero, and

who was Luna's cousin. Caballero suspected the men had robbed a bank, and confronted them with this. Luna admitted that this was indeed what had happened, and told Caballero to keep quiet. Instead, Caballero notified her aunt, who worked for the sheriff's department. The three men were eventually arrested at Caballero's house. Caballero later identified Pina and Luna in surveillance photographs from the Security Pacific robbery.

### E. Government's Use of the Uncharged Acts

Before trial, the government notified the court and defense counsel that it intended to use subsequent acts evidence to prove identity. Pina and Luna objected. The issue was briefed, and the court heard argument *in camera.* At that hearing, the government revealed that Pina and Luna had been charged with the Oregon robberies in Oregon, but that the charges had been temporarily dismissed at the request of the Assistant U.S. Attorney in Fresno so that defendants could be brought to trial on the Fresno robberies first.

After hearing argument, the district court ruled that the subsequent acts evidence could come in. After the government had presented its evidence of the two Fresno robberies, however, the court expressed concern that the charged robberies did not fit the pattern the government had claimed all four robberies followed: "I am not hearing the same case you told me I was going to hear." Tr. at 325. Luna and Pina renewed their objection to the other acts evidence. The court overruled the objection, finding that the questions about the similarity of the charged and uncharged acts were best left for the jury. The other acts evidence was admitted with a cautionary instruction, and the government itself repeatedly told the jury that the subsequent acts were to be considered

only for the limited purpose of establishing identity.

Following the trial in this case, Luna and Pina were apparently re-charged with the Oregon robberies, and they subsequently pled guilty to those crimes.

### DISCUSSION

#### A. Use of Other Crimes Evidence

Fed.R.Evid. 404(a) prohibits admission of evidence of a person's character "for the purpose of proving action in conformity therewith on a particular occasion." Fed. R.Evid. 404(b) states that evidence of other crimes may be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." A trial court's admission of evidence under Rule 404(b) is reviewed for abuse of discretion. *United States v. Garcia–Orozco,* 997 F.2d 1302, 1304 (9th Cir.1993).

Recently, this court restated a 4–part test for the application of Rule 404(b): evidence of prior or subsequent criminal conduct may be admitted if (1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in certain cases) the act is similar to the offense charged.[1] *Garcia–Orozco,* 997 F.2d at 1304 (citing *United States v. Bibo–Rodriguez,* 922 F.2d 1398, 1400 (9th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991)). If the evidence in question satisfies these requirements, the trial court must then apply Fed.R.Evid. 403. *United States v. Bradley,* 5 F.3d 1317, 1320 (9th Cir.1993).

When the other acts evidence is introduced to prove identity, as it was here, "the characteristics of the other crime or act [must] be 'sufficiently distinctive to warrant

---

1. *Garcia–Orozco* pointed out that similarity is a prerequisite when the other crimes evidence is introduced to prove intent. As set forth below, similarity is also a prerequisite when the other crimes evidence is used to prove identity. Indeed, "[a] much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity than when it is introduced to prove a state of mind." *United States v. Myers,* 550 F.2d 1036, 1045 (5th Cir.1977); John W. Strong, *McCormick on Evidence,* § 190, p. 805 (4th ed. 1992).

an inference that the person who committed the act also committed the offense at issue.' " *United States v. Perkins,* 937 F.2d 1397, 1400 (9th Cir.1991) (quoting *United States v. Andrini,* 685 F.2d 1094, 1097 (9th Cir.1982)). Conversely, " 'if the characteristics of both the prior offense and the charged offense are not in any way distinctive, but are similar to numerous other crimes committed by persons other than the defendant, no inference of identity can arise.' " *Id.* (quoting *United States v. Powell,* 587 F.2d 443, 448 (9th Cir. 1978)). In this case, Luna, joined by Pina, argues that those elements which were common to the charged and the uncharged acts were not sufficiently distinctive to permit the requisite inference to be drawn.

In its offer of proof, the government provided the following "summary of the common factors running through all four robberies": (1) they are all "take-over robberies"; (2) at least one or more robbers wore white surgical gloves, which is very unusual; (3) a white pillow case was used to take the money; (4) one robber stayed in the lobby area and was armed with a handgun; (5) the second robber was the counter jumper who removed money from multiple drawers; (6) the counter jumper grabbed the hair of the tellers in order to force them to the ground and to move them about; (7) the robbers wore long sleeve sweatshirts and sweatpants; (8) one or more of the robbers wore dark women's nylon stockings over their face; (9) the robbers wore baseball caps; (10) the robbers spoke with a Hispanic accent; (11) the robbers appeared to be between 20–30 years old; (12) a car was usually found abandoned with its engine running near the scene of the robbery; (13) the robbers used an excessive amount of profanity to intimidate and take control of the employees and customers; and (14) the robberies all occurred between 10:30 a.m. and 11:30 a.m.

Govt's Amended Notice of Intention to Offer Defendant's Subsequent Acts at Trial at 6–7.

As noted, the district court ruled that the evidence would be admitted, but after hearing the testimony of the witnesses to the two charged robberies, expressed its concern that those crimes did not fit the pattern promised by the government. In particular, the court noted that in neither robbery did it appear that one robber had stood guard in the lobby area while the other had vaulted the counter; nor was it true that in both robberies the tellers had been grabbed by the hair. Indeed, the trial judge was so concerned with the discrepancies between the offer of proof and the proof that had come in that he stated "[m]aybe we better get an order out to the U.S. Attorney's Office, any representations that are made are made under oath, or any affidavits are under oath because I am not hearing the same case you told me I was going to hear." Tr. at 325.

In much the same vein, Luna points in his appeal brief to the various disparities between the government's list of purported similarities and the evidence at trial. The government, in its brief on appeal, does not respond either to Luna's argument or to the district court's concerns (which Luna cites), but instead simply parrots back its 14–factor list, practically verbatim.[2] A review of the record, however, bears out the district court's misgivings. For example, in the Bank of America robbery, it is not true that only one robber went over the counter while the other stood guard in the lobby; nor does any testimony indicate that any hair-pulling went on in the Bank of America robbery.[3]

---

**2.** The government did remove the reference to the distinctiveness of surgical gloves. The government also properly removed references to two factors which, while probative of identity, do not establish the similarity of the charged and the uncharged acts: factor 11 (Hispanic accents) and factor 12 (age of robbers).

**3.** The government argued to the district court that even though all three of the robbers went over the counter in the Bank of America robbery, one of them remained in the "merchants' area." Tr. at 322. We do not see, however, how this addresses the district court's observation that the government's offer of proof referred to only one counter jumper, while the proof itself revealed that all three robbers jumped over the counter.

In response to the district court's statement that there had been no physical abuse in the Bank of America robbery, save on the robbers' way out, the government suggested that the surveillance photographs showed otherwise. The government has not, however, supplied (or even mentioned) these photographs on appeal.

A more accurate summary of the points of similarity is as follows. All the robberies were conducted takeover style, i.e., rather than robbing individual tellers and attempting to hide that fact from the rest of the bank, the robbers announced their presence to one and all and took control of the bank. The robberies all occurred between 10:30 and 11:30 a.m., and the robbers entered the banks noisily. In each case, the robbers wore sweatpants, sweatshirts, some kind of mask, and gloves. The robbers were armed. At least one robber jumped over the counter. The robbers swore at the tellers and pushed, tossed, or struck one or more bank employees. They took money out of one or more of the tellers' drawers and put it into bags. They used a getaway car in all of the robberies, and in both of the uncharged crimes and one of the charged crimes, they abandoned the car with its motor running.[4]

On the other hand, there were also differences. Three of the robberies were perpetrated by two persons, while the fourth was carried out by three. In two cases, the robbers commanded everybody in the bank to get down; in one case, according to one witness the robbers did *not* tell everyone in the bank to get down, while according to another witness they did; in the fourth case, there is no mention of the robbers telling anyone to get down. In two of the robberies, all of the robbers went over the counter; in one robbery, one went over the counter while another stood guard in the lobby; in another robbery, one went over the counter while one stood guard on top of it. The robbers wore surgical gloves in some cases and cotton gloves (or possibly combinations of cotton and surgical gloves) in others. They wore nylon masks in three cases, and a combination of ski masks and nylon masks in the fourth. Baseball hats were identified in some but not all cases; in one case one robber wore a hat and the other did not. It does not appear that the robbers used their own bags to carry out the money in all cases: in one of the uncharged acts, a yellow bag bearing the name of the robbed bank (and containing money) was found in the robbers' car. It is also not clear that the same kind of bag was used in those cases where the robbers apparently did bring their own: the bags were described variously as white and as beige, and as pillowcases and as canvas-type bags. In one case, the robbers used physical violence in an especially gratuitous

At the direction of the district court, the government also filed a "Summary of Evidence in Support of Admissibility Pursuant to Fed.R.Evid. 404(b)." This summary includes a chart detailing the points of similarity, and also revealing some (though by no means all) of the differences among the four robberies. The government has not referred to this chart on appeal, but instead relies on the more skeletal (and more misleading) 14–factor list.

4. Several factors were present in both of the uncharged crimes and in one of the charged crimes: two robbers, nylon stocking masks, and physical abuse of tellers to get compliance. Initially, it might seem that these factors should be credited to the government, since what the government must do is show that the uncharged acts are like the charged acts, not that the charged acts are like each other. *See United States v. Johnson*, 820 F.2d 1065, 1069–70 (9th Cir.1987) (counting in the government's favor the fact that in one respect the uncharged act was very similar to one, though not to both of the charged acts). If Charged Act 1 is different from Charged Act 2 but similar to Uncharged Acts 3 and 4, the uncharged acts evidence would be probative as to 1 although not as to 2; if the jury would be entitled to hear evidence about 3 and 4 with respect to 1, there is no reason why that evidence

should be excluded just because it is not probative as to 2.

The difficulty in applying this logic to the present case, however, is that Luna was a defendant in only one of the charged acts—# 2, the Bank of America robbery. Thus evidence of the kind just described would not be probative at all as to Luna, but it would be unfairly prejudicial, since the jury would learn that Luna had committed # 3 and # 4.

The same logic that applies to the evidence as a whole applies to individual points of similarity. Thus factors which are common to the Western Financial robbery and the two uncharged robberies should not be credited to the government. But the one factor which is common to the *Bank of America* robbery and the uncharged robberies—the "abandoned car" factor—should be counted in the government's favor.

At the same time, however, the fact that this element is not present in one of the crimes lessens its value as a distinguishing mark. Furthermore, as noted below, there were also differences among the abandoned cars in the three cases where cars were abandoned: in two cases the cars were stolen (which might suggest a prearranged plan of abandonment) while in the third case the car belonged to a friend of one of the robbers.

manner, striking an employee on their way out; in other cases, they used violence in an apparent attempt to get the tellers to open their drawers and give them money. They used violence of different kinds, sometimes pulling the hair of the tellers, sometimes bruising their arms, and sometimes both. In some cases, the robbers identified themselves as members of the Crips gang; in others, they did not. The robbers' getaway car appeared to be a stolen vehicle in some, but not in all cases.

We must determine whether the common characteristics of the four robberies are "sufficiently distinctive to warrant an inference that the person who committed the [uncharged] act[s] also committed the offense[s] at issue," or whether those common features are so generic that such an inference cannot be drawn. *Perkins*, 937 F.2d at 1400.

We conclude that the common features in this case were largely generic. This case very much fits the pattern of *United States v. Myers*, 550 F.2d 1036 (5th Cir.1977), in which the Fifth Circuit, in holding that other crimes evidence had been admitted erroneously, specifically discussed which elements of an armed bank robbery might be considered distinctive, and which are merely generic. The *Myers* court held that it was reversible error to admit other acts evidence to prove identity under Rule 404(b) where the charged and the uncharged acts had the following in common:

> (1) both crimes were bank robberies, (2) perpetrated ... between two and three o'clock in the afternoon. In both robberies the victimized bank was [3] located on the outskirts of a town, [4] adjacent to a major highway. In both robberies the participants [5] used a revolver, [6] furnished their own bag for carrying off the proceeds, and wore [7] gloves and [8] masks crudely fashioned from nylon stockings.

*Id.* at 1046. Each of these eight factors, the Fifth Circuit held, "is a common component of armed bank robbery," and hence the fact that those elements were present in both the charged and the uncharged robberies meant virtually nothing. *Id.*

In the present case, the government relies on many of the same "common components": guns, masks, gloves, bags.[5] Other common elements also collapse into generic features of a takeover robbery, in which it is almost by definition necessary to intimidate people: the loud entry; the profanity; the abuse of bank employees.[6]

This case also shares another important feature with *Myers*. Here, as there, different numbers of perpetrators are alleged to have been responsible for the different robberies (sometimes two perpetrators, sometimes three). This difference takes on particular significance when it is recalled that the government promised that the evidence would reveal that all of the robberies were characterized by a neat, two-man division of labor (counter jumper and guard), but the evidence never did reveal this. A fixed number of persons did not play fixed roles, but rather a varying number of persons divided up the work of robbing a bank differently in almost every case.

Moreover, according to the government's own theory of the case, not only different numbers of persons but also different combinations of persons were responsible for the

---

5. Perhaps if the robbers had used identical kinds of masks, gloves, and bags in every crime, the government would have come closer to proving a distinctive quality running through all four robberies. But as indicated above, there were important differences as to the *kinds* of masks, gloves, and bags which were used; similarly, although the robbers wore sweats in all cases, they did not wear the same *color* sweats. Given these differences, the common elements take on an even more generic quality: disguises for hands, face, and body; something to carry away the money in. These are elements that are common to most bank robberies; they are hardly distinctive.

6. While the government argues that the fact that the robberies were performed takeover style is itself an important point of similarity, the government by its very use of the label "takeover robbery" concedes that this is a generic type of crime. And while the government contended at oral argument that takeover robberies are rare in the Fresno area, counsel was unable to furnish the court with any information about how many such crimes are committed in the Portland area, or, indeed, in any other part of the country from which the government might also have drawn purportedly distinctive takeover robberies for the purposes of proving identity.

different robberies: Pina and Torres for Western Financial; Pina, Luna, and Torres for the Bank of America; Pina and Luna (and possibly Vaughn) for the two Oregon robberies. Without necessarily adopting Luna's argument that the lack of identity of alleged perpetrators is in itself fatal to a Rule 404(b) identity theory, we do agree that the differences in personnel, like the other differences detailed above, significantly lessen the purportedly distinctive quality of the charged and uncharged crimes. The more combinations of people who are in the business of carrying out the same supposedly distinctive brand of crime, the less distinctive that "brand" becomes.

Given the various differences among the four crimes, given the generic quality of the elements the crimes did share in common, and given the differences which existed even within the concededly common elements of the four crimes, *see supra* note 5, we conclude that the trial court erred in admitting the other crimes evidence for the purpose of showing identity.[7]

■ We recognize, of course, that other crimes evidence need only *support an inference* of identity; whether or not it *proves* identity is a question for the jury. Here, the trial judge determined that this question should in fact go to the jury, and he took considerable care in instructing the jurors on the proper use of the Rule 404(b) evidence. But letting the jury—even a well-instructed jury—decide whether or not the charged and the uncharged acts are sufficiently similar is obviously not a cure-all. The difference between the proper use of other acts evidence to prove identity and the improper use of such evidence to prove propensity is a subtle matter. It is proper to infer that two distinctive crimes (e.g., two armed bank robberies committed by a person wearing Mickey Mouse ears) were committed by the same person; it is improper to infer that two merely similar crimes (e.g., two armed bank robberies) were, since the latter conclusion depends upon an inference about character. Somewhere along the continuum from merely similar crimes to truly distinctive crimes, an improper inference about propensity (the defendant is guilty because he committed another similar crime, and because people tend to behave consistently) can become a proper inference about identity (these two acts are so distinctive that only one person could have committed them both). Drawing the line is a matter for the court, not the jury. We conclude that the district court drew the line incorrectly here.

We also feel constrained to point out that the government virtually forced the district court into error. Before trial, the government furnished the district court with a misleading offer of proof—a list of 14 points of similarity, not all of which could be found in even the two Fresno robberies. When it turned out, after the evidence pertaining to those first two robberies had been presented, that the proof was not coming in as the government had said it would, the government did not concede that there were gaps between what had been promised and what had been presented; rather, the government insisted that the proof would ultimately vindicate it. It never did.

The government's conduct on appeal has been similar to its approach in the district

---

7. In those cases where other crimes evidence has been admitted to establish a bank robber's identity, the common features were more distinctive than are the common features here. *See, e.g., United States v. Johnson,* 820 F.2d 1065, 1069–70 (9th Cir.1987) (in both the two charged acts and the one uncharged act, a lone man robbed a bank, and before asking the teller to hand over all of the money in the drawer, asked for change—the same amount of change in the uncharged act as in one of the charged acts (quarters for a $5 bill)); *United States v. Powers,* 978 F.2d 354, 361 (7th Cir.1992) (in all robberies, robber wore hat, suit, glasses, and moustache; robber carried a briefcase and handed the teller typewritten notes of similar size, content, and style), *cert. denied,* —— U.S. ——, 113 S.Ct. 1323, 122 L.Ed.2d 708 (1993); *United States v. Morgan,* 936 F.2d 1561, 1572 (10th Cir.1991) (in both robberies, robber used stolen car to drive to banks, wore mask made out of sweat pants, and used a weapon), *cert. denied,* —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992); *United States v. Hudson,* 884 F.2d 1016, 1021 (7th Cir. 1989) (in all robberies, two men came into credit union; the taller man asked for change, and both men jumped over or ran behind the counter when the teller opened the drawer to get the change; they then grabbed the cash, and fled), *cert. denied,* 496 U.S. 939, 110 S.Ct. 3221, 110 L.Ed.2d 668 (1990).

court. In its appellate brief, the government simply regurgitates the 14–factor list (with very minor corrections), and fails altogether to engage the issue, clearly set forth by appellants, of the variance between the proof at trial and what was promised in that list. Only at oral argument did the government finally acknowledge its proof problems.

At argument, the government stated that the discrepancies could be explained by "the witnesses themselves," whose testimony on certain points collapsed under the pressure of trial. The explanation does not cure the problem, let alone absolve the government. The government clung to its position at trial long after it was obvious that the proof had come in very differently from what had been promised. In short, the district court was led into error by the government. There was no turning back. Mistrial became the only option. Understandably, the district court was reluctant to invoke that drastic remedy.

## B. *Sufficiency of the Evidence*

Torres contends that there was insufficient evidence to sustain either his conviction for robbing the Western Financial Bank or his conviction for robbing the Bank of America. Pina challenges the Bank of America conviction only.

■ We reach Torres' challenge to the sufficiency of the evidence because Torres has not joined Luna and Pina's appeal on the Rule 404(b) issue. We reach Pina's challenge to the sufficiency of the evidence despite the fact that we reverse his conviction on the basis of the district court's erroneous admission of the other crimes evidence: while the remedy for this error is to grant a new trial, the remedy for a conviction based on insufficient evidence is to direct entry of a judgment of acquittal. *Burks v. United States,* 437 U.S. 1, 18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *United States v. Sitton,* 968 F.2d 947, 961 n. 4 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993); *United States v. Bishop,* 959 F.2d 820, 828 (9th Cir.1992).

Sufficient evidence exists to support a conviction if, " 'reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could. have found the essential elements of the. crime beyond a reasonable doubt.' " *Bishop,* 959 F.2d at 829 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

### 1. *Torres—Western Financial*

■ Torres contends that the evidence was insufficient on this count because witnesses initially described the robbers as black, and because the robber the government claimed was Torres was described by witnesses to have been 5'8"–5'10" tall and to have weighed 175 lbs. Torres, at the time of trial, was 5'4" to 5'5" and weighed 150 lbs.

In light of the positive identifications of Torres, both by an eyewitness and by Torres' parole officer, the anomalous descriptions on which Torres relies do not prevent a rational factfinder from finding him guilty beyond a reasonable doubt.

### 2. *Torres—Bank of America*

■ Again, Torres argues that the shortest robber was described by an eyewitness to the robbery as being 5'8". However, Torres' fingerprint was found on a gun in a car believed to be the Bank of America robbers' getaway car. That car was seen in Fresno about an hour after the robbery: the driver of the car ran three stop signs, and when an officer signalled for him to pull over, he and the two other occupants got out and fled. One of the occupants was described as being 5'5" to 5'9" and 130 to 150 lbs, which are Torres' dimensions. Inside the car, in addition to the gun bearing Torres' fingerprints, was another gun; eyewitnesses to the robbery testified that both guns were similar to those they remembered the robbers brandishing. Also inside the car were surgical gloves and a phone book with the financial institutions yellow pages torn out. In an area through which the robbers had fled, police found a sweatshirt which robbery eyewitnesses said was similar to a sweatshirt one of the robbers had worn.

All of this evidence ties the car to the robbery. Torres' prints were on a gun inside the car, and a person who matched Torres'

description was seen leaving the car. In addition, one of the Bank of America witnesses testified that one of the robbers had a tattoo on the left side of his neck, and that this was consistent with a tattoo on the left side of Torres' neck. A rational factfinder could conclude that the evidence was sufficient to establish guilt beyond a reasonable doubt.[8]

### 3. *Pina—Bank of America*

■■■ Pina was identified as one of the persons who fled from the car. Since, as just described, the government presented a great deal of evidence tying the car and its occupants to the robbery, there was sufficient evidence to sustain Pina's conviction.

## C. *Sentencing Issues*

Torres appeals two aspects of the sentence imposed by the district court.

### 1. *Upward adjustment for serious bodily injury*

■■■ Pursuant to United States Sentencing Commission, *Guidelines Manual,* § 2B3.1(b)(3)(A), the district court upwardly adjusted Torres' offense level by two for bodily injury sustained by a victim—in this case the manager at the Bank of America. Torres does not dispute that the manager was injured, but rather argues that the surveillance photos show that one of the other (taller) robbers hit the manager. Torres also argues that the injury was not a foreseeable consequence of the robbery.

Application of the Sentencing Guidelines is reviewed de novo, *United States v. Fagan,* 996 F.2d 1009, 1017 (9th Cir.1993). The district court's findings of fact are reviewed for clear error. *United States v. Chapnick,* 963 F.2d 224, 226 (9th Cir.1992).

Torres' argument is refuted by Application Note 2 to U.S.S.G. § 1B1.3, which, to illustrate the principle of foreseeability as it is used in the Guidelines, offers the following example:

> [T]wo defendants agree to commit a robbery and, during the course of that robbery, the first defendant assaults and injures a victim. The second defendant is accountable for the assault and injury to the victim (even if the second defendant had not agreed to the assault and had cautioned the first defendant to be careful not to hurt anyone) because the assaultive conduct was in furtherance of the jointly undertaken criminal activity (the robbery) and was reasonably foreseeable in connection with that criminal activity (given the nature of the offense).

Torres' case fits the Application Note precisely, and we are bound to follow that Note. *Stinson v. United States,* —— U.S. ——, ——, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993) ("commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline"); *United States v. Webster,* 996 F.2d 209, 211 (9th Cir.1993) (following *Stinson* ).

Moreover, even if this comment were not dispositive of the matter, Torres had recently participated in another robbery in which victims were dragged around and pulled by the hair. Under such circumstances, he can hardly claim that bodily injury was not foreseeable. The district court did not commit

---

**8.** As counsel for Torres conceded at oral argument, our decision in *Mikes v. Borg,* 947 F.2d 353 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3055, 120 L.Ed.2d 921 (1992), is not to the contrary. There, we held that

> in a case resting upon the premise that the defendant impressed his fingerprints on an object at the time of the commission of the crime and supported solely by evidence that the defendant's fingerprints were found on that object, the record must contain sufficient evidence to permit a jury, applying the beyond a reasonable doubt standard, to draw the infer-

ence that the defendant touched the object *during the commission of the crime.*
*Id.* at 361 (emphasis in original). While in this case there may or may not have been sufficient evidence to permit the jury to conclude, beyond a reasonable doubt, that Torres put his print on the gun during the commission of the Bank of America robbery, this was not a case in which the government rested exclusively on fingerprint evidence. The government also relied on the bank teller's description of the tattoo, and on Elerick's description of the suspects who fled from the car.

clear error by increasing Torres' offense level under § 2B3.1(b)(3)(A).

### 2. *Upward adjustment for reckless endangerment*

Under U.S.S.G. § 3C1.2, the district court is authorized to adjust the offense level upward by two levels "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." In this case, the upward adjustment was based on the robbers' flight after the Bank of America robbery.

Torres argues that the conduct in question did not rise to the level of reckless endangerment. A person is "reckless" under the Guidelines when he is aware of but disregards the risk created by his conduct, and when that conduct involves "a gross deviation from the standard of care that a reasonable person would exercise." U.S.S.G. § 2A1.4, comment. (n. 1). The testimony of the deputy from whom the robbers fled was that the car he was following ran three stop signs; that when he tried to pull the vehicle over, it stopped in the middle of the road; that as he walked toward the car, the driver reached down toward the floorboards (where a gun was later found), and that, fearing for his safety, he retreated; that after he got back into his car, the robbers' car accelerated and he chased it a short distance, after which the robbers jumped out of the car and ran. The car was still running.

Torres contends that no reckless endangerment should be attributed to him because Luna was identified as the driver of the car. But Torres is accountable under the Sentencing Guidelines for reckless endangerment which he aided or abetted. U.S.S.G. § 3C1.2, comment. (n. 5). At the very least, Torres aided and abetted the abandonment of the car. The question is thus whether abandoning a running car in a residential area is a gross deviation from ordinary care. We conclude that the district court did not commit clear error in holding that is was. *See United States v. Chandler,* 12 F.3d 1427, 1433 (7th Cir.1994) (travelling between 35 and 50 mph through a residential area, and swerving, constitute reckless endangerment);

*United States v. Sykes,* 4 F.3d 697, 700 (8th Cir.1993) (failing to pull over and thereby compelling police to force defendant off road constitutes reckless endangerment).

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**