*114 JUSTICE McKINNON,
dissenting.
¶25 In my view, the Court’s decision does great injustice to the purposes of M. R. Evid. 404(b) and opens the door to impermissible propensity evidence that previously had been closed. Because there is a substantial risk that Blaz was convicted not for what he did, but for having committed a PFMA in the past, I respectfully dissent.
¶26 Unless otherwise provided by constitution, statute, or rule, all relevant evidence is admissible. M. R. Evid. 402. Relevant evidence means “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” M. R. Evid. 401. Even relevant evidence maybe excluded, however, “if its probative value is substantially outweighed by the danger of unfair prejudice ....” M. R. Evid. 403. A further limitation on the rule of admissibility is found in M. R. Evid. 404(b), which provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
¶27 Rule 404(b) does not forbid the admission of propensity evidence or constitute a bar to propensity evidence; instead, Rule 404(b) prohibits a theory of admissibility which allows an ultimate inference to be made when it is premised upon an intermediate inference of the defendant’s personal, subjective character. If the prosecutor “can arrive at an ultimate inference of conduct through a different intermediate inference, the prohibition is inapplicable.” 1 Edward J. Imwinkelreid, Uncharged Misconduct Evidence § 4:1, 5-6 (Rev. ed. 2009). (“When the prosecutor develops a theory of logical relevance without an intermediate inference as to the defendant’s character, the theory moots one of the dangers. If the prosecutor can develop an alternative intermediate reference, Rule 404(b) will not bar the admission of uncharged misconduct.”). When the theory of admissibility depends on an intermediate inference of a defendant’s personal, subjective character traits, there is a high risk of misdecision and that the jury will convict because they find the defendant repulsive, immoral, or repugnant. Read together, these rules require the following analysis: first, is the evidence materially relevant; second, is the logical relevance independent of the intermediate inference, prohibited by Rule 404(b), that the defendant acted in conformity with bad character; and, third, does the probative value of the evidence substantially *115 outweigh the danger of unfair prejudice.[1]
¶28 We have stated that “[t]he typical prosecution case is reducible to three elements: (1) a person committed the actus reus (i.e. forbidden act) alleged in the indictment or information; (2) that person possessed the requisite mens rea (i.e., criminal intent or state of mind), and; (3) that person was the defendant).”Stewart, ¶ 64 (citations omitted). Here, there was no question that Matti was killed by nonaccidental trauma. The prosecution demonstrated through its forensic evidence and Dr. Kemp’s testimony that Matti’s death occurred through human agency, which was intentional. I agree with the Court’s assessment that this “case was largely circumstantial and relied heavily on the testimony of Dr. Kemp.” Opinion, ¶ 19. The only element that therefore remained for the State to prove concerned whether Blaz was the person who committed the crime: that is, the element of identity remained disputed. The State sought admission of the PFMA evidence based on motive, opportunity, and absence of accident or mistake. The District Court denied Blaz’s motion in limine on the basis that evidence of the prior PFMA was “reflective” and “probative of Blaz’ feeling toward [Mom] and toward [Mom’s] children living in the household.” This Court concludes, through still another theory, the PFMA was admissible as evidence of “distinctive or idiosyncratic methods” and illustrates a “criminal signature” which can be used to specifically identify Blaz. Opinion ¶ 16. However, regardless of which theory of admissibility relied upon—that offered by the State, the District Court, or this Court—none are premised upon relevance that is sufficiently independent of the intermediate inference, prohibited by Rule 404(b), that Blaz committed the crime charged because of the likelihood that he acted in conformity with his conduct underlying his PFMA. In the interest of brevity, I will address only the Court’s flawed analysis that the evidence was admissible pursuant to: (1) Blaz’s “criminal signature,” and (2) absence of mistake or accident.
¶29 A. The PFMA does not demonstrate a unique and distinctive methodology permitting an inference of Blaz’s identity.
¶30 It is well settled that the State may introduce evidence of prior bad acts to prove the defendant’s identity as perpetrator of the charged *116 crime. We have recognized recently in Daffin and Madplume, both prosecutions for sexual offenses, that evidence of a defendant’s commission of an uncharged crime with a modus operandi (method of operation) strikingly similar to that of the charged crime is permissible identity evidence pursuant to Rule 404(b). To invoke the modus operandi theory, the State must establish that “(1) both crimes were committed with the ‘same’ or strikingly similar methodology; and (2) the methodology is so unique that both crimes can be attributed to ‘one’ criminal.” Imwinkelreid, supra § 3:10, 62. We explained in State v. Kordonowy, 251 Mont. 44, 49, 823 P.2d 854, 857 (1991), that “[t]his identity exception is often used to prove other crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused.” Therefore, when evidence of other crimes or acts are introduced to prove identity, the other crime or act must be “sufficiently distinctive to warrant an inference that the person who committed the crime also committed the offense at issue.” State v. Sweeney, 2000 MT 74, ¶ 31, 299 Mont. 111, 999 P.2d 296. Significantly, “[a] much greater degree of similarity between the charged crime and the other crime is required when the evidence is introduced to prove identity than when it is introduced to prove a state of mind.” Sweeney, ¶ 31; see also 1 John W. Strong et al., McCormick on Evidence § 190, 668 (5th ed. 1999).
¶31 In Sweeney, we drew on the Ninth Circuit’s reasoning in United States v. Luna, 21 F.3d 874, 878-79 (9th Cir. 1994), and stated
The difference between the proper use of other acts evidence to prove identity and the improper use of such evidence to prove propensity is a subtle matter. It is proper to infer that two distinctive crimes (e.g., two armed bank robberies committed by a person wearing Mickey Mouse ears) were committed by the same person; it is improper to infer that two merely similar crimes (e.g., two armed bank robberies) were, since the latter conclusion depends upon an inference about character. Somewhere along the continuum from merely similar crimes to truly distinctive crimes, an improper inference about propensity (the defendant is guilty because he committed another similar crime, and because people tend to behave consistently) can become a proper inference about identity (these two acts are so distinctive that only one person could have committed them both).
Luna, 21 F.3d at 882. Thus, the methodologies for commission of the prior bad act and the crime at issue, must not only be the “same” or “strikingly similar,” but the methodology itself must be peculiar and *117 distinct such that “the modus operandi must betray the defendant’s personal criminal identity.” Imwinkelreid, supra § 3:11, 63.
¶32 Here, the Court concludes the PFMA and Matti’s death evidenced a “pattern of behavior” sufficient to establish a theory of admissibility based upon modus operandi; that is, the Court concludes that the PFMA and Matti’s death are so unique and distinctive, as demonstrated by their methodologies, that an inference arises that only Blaz could have committed them. The Court finds similarity in the “mechanics” of the injury, explaining that both Mom and Matti sustained head injuries resulting from an impact to a “broad” surface. Opinion, ¶ 17. The Court states they were “violent” acts “directed at the head ....” Opinion, ¶ 17. The Court finds features of uniqueness in that both victims were “family members” and that the crimes occurred “in the privacy of the family home.” Opinion, ¶ 17. This evidence, however, is generic and characteristic of many crimes. Unfortunately, domestic violence and crimes against family members are not unique or distinctive. Indeed, they include a large and diverse class of victims. Furthermore, there is nothing unique or distinctive about committing a crime in private, or doing so in the “privacy of the family home.” Crimes against persons normally are “violent” and there is nothing unique about a generalized trauma to the head. Even assuming the appropriateness of the Court designating for the State its theory of admissibility, the Court fails in its attempt to find uniqueness and distinction in what can only be characterized as generic evidence. There is nothing inherently unique and distinctive about the two acts that would point only to Blaz, except that on both occasions Blaz acted in conformity with bad character.
¶33 Conversely, the crimes are distinguishable based upon the following: Mom was injured when Blaz attempted to hold Matti in the first offense, while Matti, who remained asleep during the entire PFMA offense, was not injured; Blaz was intoxicated during the first offense, but not the second; the first offense was directed towards an adult spouse, Mom, and the second offense was directed towards an infant; there was no evidence that Blaz, either intentionally or negligently, was attempting to physically hurt Matti in the first offense, while in the second offense, Matti’s death was the result of an intentional act. While many acts of domestic violence will exhibit a pattern or course of conduct establishing a “criminal signature” of the defendant, this is not one of those cases. To be certain, cycles of domestic violence could be relevant in the context of Rule 404(b) evidence. Yet, without evidence of distinctiveness or uniqueness, domestic violence victims are members of a large class, which in and *118 of themselves, do not necessarily establish a “criminal signature” upon the perpetrator. Moreover, while “[a] few states have adopted a specific rule to allow evidence of past acts of domestic violence, by the same defendant against the same victim, to be admitted in prosecutions involving domestic violence without worrying about the purpose for the evidence...,” Montana has not. 1 Kenneth S. Broun, McCormick on Evidence § 190, 1042 (7th ed. 2013) (footnote omitted). Today’s decision, however, effectively creates a rule through the expedient of relabeling Blaz’s propensity for domestic violence as a “criminal signature” and also demonstrating “absence of mistake or accident.” See infra.
¶34 In Daffin, the defendant was charged with 13 sexual offenses, many of them involving children. The Court found the following sufficiently established Daffin’s “criminal signature:”
Here, the testimony of the former victims and other witnesses was used to establish Daffin’s methods of victim selection and grooming. Some common elements of Daffin’s “criminal signature” included: supplying his victims with alcohol and drugs; driving his victims around in his vehicle; “partying” with his victims; taking them “mudding”; and, eventually, assaulting them. Testimony about Daffin’s pattern of sexual abuse detailed a process that started with “flirting”; escalated to sexual conversation and touching that bordered on sexual; proceeded to sexual contact; and concluded by telling the victims they were at fault or complicit in the abuse, and swearing them to silence.
Daffin, ¶ 18 (footnotes omitted).
¶35 Similarly in Madplume, the defendant was charged with deliberate homicide pursuant to the felony murder rule, with sexual intercourse without consent as the predicate offense. The Court affirmed admission of evidence involving the rape of a different male victim. The Court explained:
Here, the State used the similar circumstances of the uncharged J.B. incident to show Madplume’s plan. Just as he had done with J.B., Madplume invited Kenmille to accompany him and a younger cousin to Wild Horse under the guise of drinking and partying together. Just as he tried to do with J.B., Madplume carried out the same plan of getting Kenmille intoxicated and isolating him in Room Four’s private hot tub so Madplume could have sex with him. The State’s argument about Madplume’s purpose for bringing a younger cousin along in each incident did not imply that all homosexual men prey on straight men. Nor did the argument insinuate that homosexual men are predisposed to *119 sexually assaulting straight men. Rather, the State permissibly used the similar uncharged act to show the steps in Madplume’s plan to have sex with Kenmille at Wild Horse. Unlike Franks, where the prosecution used the other acts evidence to imply the defendant had a propensity for child molestation, the logical chain connecting the J.B. incident to Kenmille’s death did not involve an impermissible character or propensity inference.
Madplume, ¶ 29.
¶36 In contrast, we found in Sweeney that that the alleged sexual misconduct on both occasions was not “necessarily distinctive in the context of sexual assaults.” Sweeney, ¶ 34. “Sweeney allegedly performed acts, involving different victims, of a nature that unfortunately give rise to many sexual assault cases.” Sweeney, ¶ 34. We concluded that “[tjhere [was] nothing in Sweeney’s alleged conduct that was sufficiently distinctive to warrant an inference that since he committed the prior sexual assault he must have committed the sexual assault [for which he was charged].” Sweeney, ¶ 34. While having some similarities, we described the evidence in Sweeny as follows:
In this case, there is some similarity between the age and gender of the victim and the sexual behavior involved in the 1988-89 sexual assault and the 1996 sexual assault,[sic] however, there are also a number of differences. The sexual behavior involved in 1988-89 included Sweeney getting on top of his five-year-old stepdaughter, licking her genitalia, and placing her hands on his penis. With regard to the 1996 assault, Sweeney’s nine-year-old niece testified that Sweeney had licked her genitalia and had on another occasion unbuttoned her shirt and pants and touched her chest. In addition, Sweeney's niece testified that on the occasion where he had unbuttoned her clothing, Sweeney had put his hand over her mouth to stop her from screaming and told her to shut up.
Sweeney, ¶ 34.
¶37 The aforementioned authorities are only a few examples of our prior careful analysis of modus operandi evidence to demonstrate identity of the defendant. See also Salvagni, ¶ 60; Kordonowy, 251 Mont. at 44, 823 P.2d at 854; Aakre, ¶¶ 21-29. We have never allowed, as here, the admission of prior acts evidence on the basis of a contrived “linking” together of generic evidence. Opinion, ¶ 16. In doing so, we have distorted our precedent and the purposes underlying Rule 404(b), and opened the door to impermissible propensity evidence. Unfortunately, there is nothing unique or distinctive about crimes *120 against family members committed in the home, and which are both violent and involve injuries to the head. Accordingly, the evidence is not admissible under a theory that it demonstrates a modus operandi, a “criminal signature,” or a “distinctive or idiosyncratic method!]” of the accused.
¶38 B. The PFMA is not permissible 404(b) evidence of mistake or absence of accident.
¶39 The Court also mistakenly finds the PFMA evidence could be admitted to demonstrate the absence of mistake or accident. Here, the Court concludes that the PFMA “illustrated a pattern of behavior” by Blaz that linked Blaz’s “documented actions and the manner of Matti’s death.” Opinion, ¶ 19. Aside from an improper reliance upon the “pattern of behavior” the Court finds to establish identity, the use of evidence to demonstrate absence of mistake or accident relates to the actus reus of the crime; that is, whether the crime was accidental or actually a “forbidden act.” Stewart, ¶ 65. Here, there is no question, based upon Dr. Kemp’s testimony and the forensic evidence, that the crime was not an accident. The appropriate use of evidence demonstrating absence of mistake or accident is premised upon the inference that as the number of incidents increase, the objective probability of accident decreases. That is, it is highly unlikely that the same crime would be committed by so many similar accidental acts. The permissible inference arising from an absence of mistake or accident allowed by Rule 404(b) is that it defies common sense or logic to find coincidence on so many occasions.
¶40 The parties do not dispute that Matti’s death was not an accident. Significantly, in Salvagni, while the trauma to the victim was “indicative of non-accidental trauma, most likely due to compression of the chest,” the cause of death was “undetermined” even though “no definitive natural cause of death was identified.” Salvagni, ¶ 13. The State intended to prove circumstantially that the defendant purposely and knowingly caused her child’s death by suffocating her through a prior incident in which the defendant “placed [the victim’s sister] face down in her crib with a blanket rolled up and tied to each side of the crib and the blanket placed on [the child’s] neck.” Salvagni, ¶ 65. The Court held that the prior bad acts evidence was offered to demonstrate “that [the victim] did not die accidentally” and was “relevant to her intent and to rebut the suggestion that [the victim’s] death was accidental.” Salvagni, ¶ 65 (emphasis added). We did not decide whether, under the particular facts, the State had established a non-propensity inference for admission of the evidence. In fact, we directed *121 that on remand, the State would have to develop a more detailed explanation of the incidents and the District Court would have to conduct an analysis on any objections raised. Salvagni, ¶ 65. Accordingly, while perhaps admissible as impeachment or rebuttal evidence, Salvagni does not establish that the State may offer prior bad acts evidence under Rule 404(b) when the non-accidental nature of the victim’s death is undisputed.
¶41 In these proceedings, there was no dispute that Matti’s death was non-accidental and the result of a “forbidden act.” Stewart, ¶ 65. The actus reus was undisputed and established by forensic testimony. Although, as the trial unfolded, the PFMA may have been admissible pursuant to other admissibility theories, the District Court erred in denying Blaz’s motion in limine when the stated purpose for admissibility by the State was pursuant to Rule 404(b).
¶42 Finally, assuming arguendo, there was a dispute regarding whether Matti’s death was accidental, evidence of the prior PFMA would not have demonstrated a lack of coincidence sufficient to infer that Matti’s death was unlikely to have been an accident or mistake. Evidence of this nature, admitted substantively in the State’s case-in-chief, would have to provide a sufficient evidentiary correlation to allow an inference that Matti’s death could not have been the result of coincidence. Here, the evidence of a single prior PFMA was insufficient to establish such a correlation and inference. Accordingly, any evidence that Neighbor Boy caused Matti’s death would have to be supported by an alternative theory of admissibility—impeachment, rebuttal, or some other acceptable premise.
CONCLUSION
¶43 I would conclude that the PFMA evidence was improperly admitted pursuant to Rule 404(b). Further, I would conclude that the prejudicial nature of the evidence of domestic abuse, and the danger the jury would decide the case on this improper basis, demonstrates that qualitatively there was no reasonable probability the evidence did not contribute to Blaz’s conviction.
¶44 I would reverse and remand for a new trial.
JUSTICE SANDEFUR joins the dissent.

 In a criminal prosecution, most of the evidence will be prejudicial to the defendant. State v. Stewart, 2012 MT 317, ¶ 68, 367 Mont. 503, 291 P.3d 1187 (citing State v. Belanus, 2010 MT 204, ¶ 14, 357 Mont. 463, 240 P.3d 1021). Thus, “unfair” prejudice refers to the degree the jury might impermissibly rely on the intermediate inference of propensity.