# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-KA-00775-COA

**JOSE A. MELENDEZ A/K/A JOSE ANGEL**                    **APPELLANT**
**MELENDEZ**

**v.**

**STATE OF MISSISSIPPI**                                      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/07/2021 |
| TRIAL JUDGE: | HON. DAL WILLIAMSON |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES SAMPADA KAPOOR |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | ANTHONY J. BUCKLEY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/24/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., SMITH AND EMFINGER, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Jose Melendez appeals his convictions of second-degree murder and aggravated assault.  On appeal, Melendez challenges the sufficiency of the evidence supporting his conviction for second-degree murder.  Melendez also argues that his trial counsel was constitutionally ineffective for failing to request jury instructions on imperfect self-defense and culpable-negligence manslaughter.  Finally, Melendez asserts that the circuit court erred by giving a flight instruction.  Finding no error, we affirm.

## FACTS

¶2.     In November 2019, Tasha Fuentes was living in a trailer in Jones County with her boyfriend, Melendez.  Fuentes testified that she and Melendez had been dating since 2015. Three of Fuentes's children, whom she shared with her ex-husband, Lester Delgado, also lived in the trailer.  Fuentes and Delgado both owned the property on which the trailer was located.

¶3.     Fuentes worked as a welder.  She testified that in the week of November 6, 2019, she was working the day shift, and her hours were 6:00 a.m. until approximately 6:00 p.m.  On November 6, 2019, Fuentes arrived home after work and began cooking dinner for Melendez. Fuentes explained that she could not finish cooking because she did not have the rice that Melendez wanted.  Fuentes testified that when Melendez arrived home from work, he was drunk, and the couple began arguing about the rice and about money.  Fuentes stated that Melendez grew angry, and he then left the trailer and drove off to purchase some rice.

¶4.     While Melendez was gone, Fuentes went to her room to do some laundry.  She eventually heard a noise in the living room and came out to see what was going on.  Fuentes testified that she saw Melendez and her ex-husband, Delgado, arguing.  Fuentes asked what was going on, and Delgado responded that his and Fuentes's son Isack had missed a lot of school.  Fuentes explained that a truancy officer had sent her and Delgado a letter regarding Isack's absences.  Because Melendez was usually home at the trailer when Isack needed to get to school, Delgado was demanding that Melendez either take Isack to school or make sure he got on the bus.

2

¶5. Fuentes testified that during the altercation, Delgado slapped Melendez in the face. Fuentes yelled at Delgado and told him to stop and to "leave it alone." Melendez threatened to leave. Delgado responded that it was not his house, so he could not tell Melendez to leave. However, Delgado reiterated that Melendez needed to make sure that Isack got to school. Fuentes testified that Delgado left, and Melendez left soon after.

¶6. Fuentes testified that while Delgado and Melendez were arguing, she had called her twenty-two-year-old son, Dalton White, to come to the trailer to make them stop arguing. Fuentes stated that by the time White arrived at the trailer, Melendez and Delgado had already left. White stayed for approximately ten minutes and then left.

¶7. Delgado testified as to his version of the events. He stated that around 8:30 p.m. on November 6, 2019, he went to Fuentes and Melendez's trailer. Delgado explained that he was concerned because his son Isack had been missing school, and Delgado wanted to talk to Melendez about it. Delgado testified that he and Melendez talked about Isack missing school, and Melendez "got an attitude." Delgado then asked Melendez why the yard around the trailer "look[ed] like a junk yard." Delgado testified that Melendez grew angry, and the two men started pushing each other. Delgado admitted that he slapped Melendez on his face, which left a red mark. Delgado testified that he eventually backed away from Melendez and informed him that he was going to leave Melendez alone, and Delgado left. Delgado testified that only he, Melendez, and Fuentes were present during the altercation.

¶8. After the incident, Melendez went to the Laurel Police Department to make a

3

complaint against Delgado. Because the incident occurred in the county, Officer Joe Blakeney of the Jones County Sheriff's Department was asked to meet Melendez at the police department. Melendez, with help from an interpreter, reported to Officer Blakeney that Delgado had "beat him up." Officer Blakeney took photos of Melendez's injuries. Officer Blakeney testified that he tried to locate Delgado that evening in order to question him regarding Melendez's allegation, but Officer Blakeney was unable to do so. He also stated that he was unable to verify whether Melendez's version of the events was true.

¶9. At trial, Officer Blakeney was shown photos of Melendez's face. The photos showed a red mark on Melendez's face, as well as a cut and dried blood on his nose. Officer Blakeney confirmed that the photos accurately depicted the injuries he observed on Melendez's face on the evening of November 6.

¶10. Fuentes testified that at approximately 10:00 p.m. that same evening, Melendez sent her a text message asking her to put his belongings in a bag because "[i]t's best for [him] to just leave." Fuentes agreed and told him that she would put his things together and that he could come by and get them. Fuentes then called White again and told him that Melendez was coming back to get his belongings. White asked Fuentes if she was scared, and Fuentes answered that she was. At trial, Fuentes explained that she was always in fear that Melendez would destroy something in her house or her car. White told Fuentes to call him if she needed him, and he told her if she wanted him to come over to the trailer, he would come. Fuentes told White not to worry about it and that if he wanted to come to the trailer, it was

up to him.

¶11.    Fuentes testified that around 1:00 a.m., Isack ran to her and said that he heard hollering outside.  Fuentes went to see what was going on, and she saw Melendez and White talking.  Fuentes also saw White's girlfriend, Hannah Maxcey, and White's friend, Cody Ingersoll.  Fuentes could see Melendez standing between his car and the opened driver's side door.  Fuentes testified that White was standing in front of Melendez about ten feet away.

¶12.    Fuentes asked what was going on, and she heard White tell Melendez that he needed to leave.  White then turned to Fuentes and asked if she wanted Melendez to leave, and Fuentes answered yes.  According to Fuentes, Melendez then took a sip of the beer he had been holding, set it on top of his car, and asked Fuentes if that was what she wanted.  Fuentes told him yes.  Fuentes testified that Melendez immediately lifted his right hand over the car door and shot her, causing her to fall.  Fuentes called out to White, and White responded, "Mama."  Melendez then came around his car door with his hand up and shot White, who also fell to the ground.

¶13.    After he shot Fuentes and White, Melendez "jumped" into his car, spun his tires, and left.  Fuentes testified that Isack retrieved her cell phone to call the police, and Fuentes lost consciousness before the police and ambulance arrived.

¶14.    Fuentes and White were transported to the hospital.  White died after arriving at the hospital.  Fuentes was treated for her injuries, but she testified that as a result of the shooting, she is now a paraplegic.  Fuentes clarified at trial that at no point prior to the shooting did

White approach Melendez. Fuentes also testified that only Melendez had a weapon, and she stated that she did not even know that Melendez had a weapon until he shot her.

¶15. At trial, Deputy Chief Medical Examiner Dr. David Arboe testified that he performed an autopsy on White. Dr. Arboe testified that White's cause of death was a gunshot wound to the chest, and the manner of death was homicide.

¶16. At trial, Maxcey and Ingersoll both testified as to the events that occurred on the evening of November 6, 2019. Maxcey testified that at the time of the shooting, she and White lived together in a residence approximately twenty minutes away from Fuentes's trailer. Maxcey explained that although she and White used to live in the trailer with Fuentes and Melendez, they had moved out several months earlier. Ingersoll had planned to spend the night at White and Maxcey's residence.

¶17. Maxcey testified that at some point after midnight, Fuentes called White and informed him that Melendez was returning to the trailer to pick up his belongings. According to Maxcey, White asked Fuentes if she wanted him to call the police. Fuentes responded, "No." White then asked Fuentes if she wanted him to come over to the trailer. Fuentes never responded, so White, Maxcey, and Ingersoll drove to the trailer. Maxcey clarified that it was her understanding that Fuentes wanted Melendez to leave the trailer, so she, White, and Ingersoll went to the trailer for the purpose of getting Melendez to leave.

¶18. When White, Maxcey, and Ingersoll arrived at the trailer, Melendez was outside the trailer in his vehicle. White, Maxcey, and Ingersoll parked and exited their vehicle. White

then approached Melendez while Maxcey and Ingersoll stood nearby. Maxcey testified that White and Melendez were approximately six to seven feet away from each other, but Ingersoll testified that White was standing inside the open door of Melendez's vehicle. According to Maxcey, White and Melendez "started talking, arguing kind of in Spanish." Maxcey stated that at this point, Melendez had one foot in his vehicle and the other outside the vehicle. Fuentes then walked outside and asked what was going on. Fuentes, White, and Melendez began speaking to one another in Spanish for approximately five to ten minutes. Both Maxcey and Ingersoll testified that White eventually looked at Fuentes and asked her in English, "Do you want [Melendez] to leave?" Fuentes responded, "Yes." Melendez then repeated, "Yes?" back to Fuentes, questioning her. Fuentes responded with an affirmative "[y]es." Melendez then pulled out a gun and shot Fuentes and then turned and shot White. Melendez then got into his vehicle and drove off. Maxcey and Ingersoll both testified that neither White nor Fuentes had a weapon.

¶19. Officer Blakeney testified that at around 1:30 am, he was dispatched to Fuentes's trailer to investigate a shots-fired call. Officer Blakeney was the first officer on the scene, and he observed four individuals outside the trailer: Fuentes and White were on the ground, wounded, and Maxcey and Ingersoll were rendering aid. Maxcey and Ingersoll informed Officer Blakeney that Melendez had shot Fuentes and White.

¶20. Investigator J.D. Carter, a criminal investigator with the Jones County Sheriff's Department, was also dispatched to the scene. As part of his investigation, Investigator

7

Carter obtained an arrest warrant for Melendez. Investigator Carter testified that when he discovered that Melendez had family in Morgan City, Louisiana, the authorities in Morgan City were alerted to be on the lookout for Melendez. A few days later, officers in Morgan City placed Melendez in custody after finding Melendez at his father's home, hiding in a closet.

¶21. Investigator Carter and another officer transported Melendez back to Jones County. Investigator Carter, assisted by a certified translator, conducted a recorded interview of Melendez. Investigator Carter informed Melendez of his *Miranda*[1] rights. Melendez waived his rights and agreed to talk to Investigator Carter. This interview was recorded and played for the jury.

¶22. During the interview, Melendez stated he had known White for as long as he had known Fuentes—six years. Melendez said that in all that time, he had never had a problem with White. He explained, however, that every time Melendez and Fuentes had a problem, Fuentes would call White, and White would come to the trailer.

¶23. Melendez stated that after the altercation with Delgado, he was afraid for his life. When he returned to the trailer, he sat in his car with the door ajar and smoked a cigarette. He saw a vehicle approach the trailer, so Melendez grabbed his gun and put it in his jacket.

¶24. Melendez stated that when he saw White and Ingersoll approach him, he thought they were going to kill him. Melendez said that White began speaking to him in an aggressive

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

manner, saying, "[W]e are no longer friends, I want to kill you." Melendez said that during the conversation, White was standing about five feet away from him, and Ingersoll was pacing some distance away. During the commotion, Fuentes ran outside. Melendez stated that he did not want to kill anyone and that he shot his gun twice because he "wanted [White and Ingersoll] to go away." Melendez said he shot at Ingersoll first before turning to shoot White. Melendez stated that he did not intend to hurt Fuentes because he loved her. Melendez also informed Investigator Carter that after the shooting, he went to Morgan City because he wanted to see his niece and his father "for the last time."

¶25.    During the interview, Melendez described Ingersoll's movement at the scene prior to shooting at him, stating, "I see him blurry in front of me." The jury heard testimony that Melendez is cross-eyed. Investigator Carter testified that if he had had any concerns with Melendez's vision upon arrest or during the interview, he would have taken him to be tested by a doctor. Investigator Carter testified that based on Melendez's ability "to drive, flee the area, flee the State and sign his name on the *Miranda* forms, there didn't . . . appear to be an issue with his eyes at the time." Fuentes also denied that Melendez had any vision problems, explaining, "He [doesn't] have problems with his vision. He's just cross-eyed."

¶26.    Melendez described the area where he had disposed of the gun after the shooting. Officers went to the area to try to find it but were unsuccessful. Later, a person named Glennis Cooley found and collected the gun from the area Melendez described. Cooley called the police and told dispatch what he had found. Officer Josh King went to Cooley's

9

home to retrieve the gun. Officer King collected the weapon, which was jammed with two bullets inside. He cleared the weapon and put it in the evidence locker at the sheriff's department. At trial, an expert in the field of firearms and projectile examinations testified that the spent shell casing recovered from the scene and the bullet recovered from White's back both had been shot from Melendez's gun.

¶27. Melendez was indicted for one count of first-degree murder and one count of aggravated assault. After a trial, the jury returned a verdict finding Melendez guilty of second-degree murder (depraved-heart murder) and aggravated assault. The circuit court sentenced Melendez to serve thirty-four years in the custody of the Mississippi Department of Corrections (MDOC) for his second-degree murder conviction and twenty years in the custody of the MDOC for his aggravated assault conviction. The court ordered the sentences to be served consecutively.

¶28. Melendez filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. The circuit court denied the motion, and this appeal followed.

## DISCUSSION

### I. Sufficiency of the Evidence

¶29. Melendez argues that the evidence presented at trial was insufficient to support his second-degree murder conviction. Melendez submits that the evidence was only sufficient to support a manslaughter conviction.

¶30. When reviewing a challenge to the sufficiency of the evidence on appeal, we must

examine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Garrett v. State*, 344 So. 3d 849, 851 (¶12) (Miss. 2022). "We view all of the evidence in the light most favorable to the prosecution, accept all the evidence supporting the verdict as true, and give the prosecution the benefit of all favorable inferences that reasonably may be drawn from the evidence." *Id*. "We will reverse and render if the facts and inferences favor the defendant with such force that reasonable jurors could not find him guilty beyond a reasonable doubt." *Smoots v. State*, 310 So. 3d 1184, 1189 (¶17) (Miss. Ct. App. 2020). "However, we must affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (internal quotation marks omitted).

¶31. Melendez was charged with first-degree murder and aggravated assault. At trial, the jury was instructed that if they did not find Melendez guilty of first-degree murder, they should continue deliberating and consider the elements of second-degree murder. Jury Instruction S-12A defined second-degree murder as

> the killing of a human being without the authority of law by any means or in any manner when done in the commission of an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premedi[t]ated design to effect the death of any particular individual.

*See* Miss. Code Ann. § 97-3-19(1)(b) (Supp. 2017). The Mississippi Supreme Court has defined second-degree (depraved-heart) murder as encompassing "a reckless and eminently dangerous act directed toward a single individual." *Swanagan v. State*, 229 So. 3d 698, 704

(¶24) (Miss. 2017). "A finding of malice is not required for depraved-heart murder." *Id*.

¶32. Melendez argues that the evidence failed to establish beyond a reasonable doubt that he committed "an act eminently dangerous to others and evincing a depraved heart." Melendez asserts that the evidence instead showed that he acted in self-defense because he believed he was in fear of harm from White and Ingersoll. Melendez asserts that his fear was exacerbated by the physical attack he had endured earlier in the day by Delgado. Melendez also argues that during his interview with police officers, he explained that during the moments leading up to the shooting, he saw Ingersoll moving "blurry" in front of him, and that movement was the reason why he fired. The supreme court has held that "[t]he issue of justifiable self-defense presents a question of the weight and credibility of the evidence rather than sufficiency and is to be decided by the jury." *Id.* at 703 (¶22).

¶33. Our review of the record reflects that the jury was instructed on first-degree (deliberate-design) murder, second-degree (depraved-heart) murder, heat-of-passion manslaughter, and justifiable homicide (self-defense). After considering the evidence and instructions that were presented, the jury resolved the evidentiary conflict by concluding that Melendez was guilty of second-degree murder. After viewing the evidence in the light most favorable to the prosecution, we find that the State presented sufficient evidence to establish the essential elements of second-degree murder. Fuentes, Maxcey, and Ingersoll all testified that during White and Melendez's verbal altercation, White was unarmed and at no point moved toward Melendez. Testimony also reflects that after Fuentes confirmed she wanted

12

Melendez to leave the trailer, Melendez immediately shot her and then turned and shot White. Melendez then jumped into his vehicle and sped off.

¶34. We find that the evidence was sufficient to establish the elements of second-degree murder; accordingly, we find no error.

## II.      Ineffective Assistance of Counsel

¶35. Melendez next argues that his trial counsel provided ineffective assistance of counsel by failing to request jury instructions on imperfect self-defense and culpable-negligence manslaughter. Melendez asserts that if his trial counsel had fully investigated Melendez's case and argued for an imperfect self-defense instruction and a culpable-negligence manslaughter instruction, a reasonable probability exists that the outcome of the trial would have been different.

¶36. In an ineffective-assistance-of-counsel claim,

> a defendant must show that: (1) his counsel's performance was deficient, and (2) this deficiency prejudiced his defense. The burden of proof rests with the defendant to prove both prongs. Under *Strickland* [*v. Washington*, 466 U.S. 668, 687 (1984)], there is a strong presumption that counsel's performance falls within the range of reasonable professional assistance. To overcome this presumption, the defendant must show that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different.

*Renfrow v. State*, 202 So. 3d 633, 636 (¶7) (Miss. Ct. App. 2016). "When determining if both prongs of the *Strickland* test have been met, this Court must look to the totality of the circumstances." *Id*.

¶37. "[T]his Court may consider the merits of a claim for ineffective assistance of counsel

13

raised for the first time on direct appeal." *Metcalf v. State*, 265 So. 3d 1242, 1250 (¶35) (Miss. Ct. App. 2019). However, "it is unusual to do so because we are limited to the trial court record in our review of the claim and there is usually insufficient evidence within the record to evaluate the claim." *Id*. Therefore, "[t]he appropriate conclusion is usually to deny relief, preserving the defendant's right to argue the same issue through a petition for post-conviction relief." *Id*. (citation and internal quotation mark omitted). This Court will address the merits of an ineffective-assistance-of-counsel claim on direct appeal when "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Id*. at 1250-51 (¶35) (quoting *Wilcher v. State*, 863 So. 2d 776, 825 (¶171) (Miss. 2003)). Further, we may address such "claims on direct appeal when the record affirmatively shows that the claims are without merit." *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020).

¶38.    As stated, Melendez argues that his trial counsel was ineffective because he failed to request jury instructions on imperfect self-defense and culpable-negligence manslaughter. We recognize that "[c]ounsel's decision not to request a specific jury instruction falls under the category of trial strategy, and is given much deference by this Court." *Fair v. State*, 950 So. 2d 1108, 1111 (¶9) (Miss. Ct. App. 2007) (citing *Smiley v. State*, 815 So. 2d 1140, 1148 (¶¶31-32) (Miss. 2002)). Here, we are "in the dark about whether counsel for [Melendez] even considered an imperfect self[-]defense theory" or culpable-negligence manslaughter

14

theory "or what his reasons were for not requesting an instruction on that theory." *Ambrose v. State*, 133 So. 3d 786, 794 (¶25) (Miss. 2013). Melendez may have been entitled to these specific jury instructions upon request; however, "it is improper for this Court, without more, to second-guess defense counsel's trial strategy." *Robinson v. State*, 25 So. 3d 1084, 1086 (¶11) (Miss. Ct. App. 2010). We therefore decline to do so.

¶39. Furthermore, "[o]ur review of the record as a whole, without further factual inquiry, reflects no obvious deficient performance by [Melendez's] trial counsel." *Id*. Where there are no obvious defects in counsel's performance, "the parties must stipulate that the record is adequate for direct review of an ineffective assistance of counsel claim before we address the merits of the claim on direct appeal." *Id*. (internal quotation marks omitted). Here, the parties did not stipulate that the record is adequate for us to make a finding on direct appeal.

¶40. "Given the fact-specific nature of any claim for ineffectiveness, any claim based on the theory of ineffective assistance of counsel is better developed through a petition for postconviction relief." *Grace v. State*, 290 So. 3d 1261, 1265 (¶14) (Miss. Ct. App. 2019). We accordingly dismiss Melendez's ineffective-assistance-of-counsel claim without prejudice to his ability to raise this issue in post-conviction collateral proceedings. *See Ambrose*, 133 So. 3d at 794 (¶26).

¶41. As an alternative to his ineffective-assistance-of-counsel claim, Melendez argues that the circuit court committed plain error by failing to distinguish imperfect self-defense from self-defense and by failing to instruct the jury on culpable-negligence manslaughter.

15

However, Melendez did not request an instruction or clarification regarding imperfect self-defense and self-defense, nor did he request a culpable-negligence manslaughter instruction. The supreme court has held that "trial courts are not required to give sua sponte instructions or instructions supplementing those requested by the parties." *Bernard v. State*, 288 So. 3d 301, 312 (¶41) (Miss. 2019). Further, as acknowledged by the State, Melendez failed to provide any authority in support of his argument that the circuit court's failure to sua sponte instruct the jury amounted to plain error. We therefore find no error.

### III. Flight Instruction

¶42. Melendez's final argument is that the circuit court erred in giving a flight instruction. Melendez specifically claims that the circuit court erred by instructing the jury on the weight to be given regarding evidence of flight. We review a court's decision to give jury instructions for an abuse of discretion. *Anderson v. State*, 185 So. 3d 966, 969 (¶9) (Miss. 2015).

¶43. The record shows that the State requested a flight instruction (Jury Instruction S-6), which instructed the jury as follows:

> "Flight" is a circumstance from which guilty knowledge and fear may be inferred. If you believe from the evidence in this case beyond a reasonable doubt that the defendant, Jose A, Melendez, did flee or go into hiding, such flight or hiding is to be considered in connection with all other evidence in this case. You will determine from all the facts whether such flight or hiding was from a conscious sense of guilt or whether it was caused by other things and give it such weight as you think is entitled to in determining the guilt or innocence of the defendant, Jose A. Melendez.

The circuit court gave the instruction. The record reflects that Melendez did not object to

16

this instruction at trial. As a result, "he is procedurally barred from raising this issue on appeal." *Williams v. State*, 98 So. 3d 468, 474 (¶31) (Miss. Ct. App. 2012).

¶44. Notwithstanding the procedural bar, we find that the circuit court did not err in giving the flight instruction. The supreme court has held that "[a] flight instruction may be given if 'that flight is unexplained and somehow probative of guilt or guilty knowledge.'" *Anderson*, 185 So. 3d at 970 (¶10) (quoting *Reynolds v. State*, 658 So. 2d 852, 856 (Miss. 1995)). First, the circuit court "must . . . determine whether the evidence of flight is probative." *Id*. at (¶11); *see also United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977). "Probative is defined as 'tending or serving to prove.'" *Anderson*, 185 So. 3d at 970 (¶10). The supreme court explained that "unexplained flight need only 'tend to prove' guilt or guilty knowledge to satisfy the . . . probative requirement." *Id*. Then, "[i]f the [circuit court] determines the evidence of flight is probative, he sends the issue to the jury for appropriate weighing ('to prove or disprove')." *Id.* at (¶11).

¶45. In the case before us, the State presented evidence of Melendez's flight after the shooting. Melendez's interview with Investigator Carter was admitted into evidence, and the video of the interview was played for the jury. Melendez admitted that after the shooting, he went to Morgan City to see his father and niece one last time. The State requested a flight instruction, and after determining that the evidence of flight in this case had probative value, the circuit court gave the instruction. "A trial judge is in the best position to determine whether the flight had probative value, sufficient to send the issue to the jury, based on the

17

evidence adduced at trial." *Id.* at 970-71 (¶13).

¶46. Our review of the flight instruction shows that the jury was instructed that if they believed "beyond a reasonable doubt that [Melendez] did flee or go into hiding, such flight or hiding is to be considered in connection with all other evidence in this case." The jury was further instructed to determine from the facts "whether such flight or hiding was from a conscious sense of guilt or whether it was caused by other things and give it such weight as you think is entitled to" in determining Melendez's guilt or innocence. After our review, we find that the circuit court did not abuse its discretion in giving the flight instruction.

¶47. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**